UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
PETERSEN ENERGIA INVERSORA, S.A.U.,:
AND PETERSEN ENERGIA, S.A.U.,       :
                                    :
            Plaintiffs,             :
                                    :        15-cv-2739 (LAP)
        -v.-                        :        OPINION & ORDER
                                    :
ARGENTINE REPUBLIC and YPF S.A.,    :
                                    :
            Defendants.             :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-9-16

LORETTA A. PRESKA, United States District Judge:

Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (collectively, "Petersen" or "Plaintiffs"), bring this action against the Republic of Argentina ("Argentina") and YPF S.A. ("YPF") (collectively, "Defendants"), alleging that the Defendants breached obligations arising out of YPF's bylaws upon Argentina's expropriation of YPF shares. Defendants move to dismiss the action on various grounds, including: lack of subject matter jurisdiction and personal jurisdiction, the act of state doctrine, violation of New York State champerty law, lack of standing, the doctrine of forum non conveniens, and failure to state a claim. On July 20, 2016, the Court held oral argument on Defendants' motions. For the reasons stated below, Defendants' motions (dkt. nos. 23, 32) are granted in part and denied in part.

I. BACKGROUND[1]

Plaintiffs are limited-liability companies organized under the laws of the Kingdom of Spain.  (Complaint, dated Apr. 8, 2015 [dkt. no. 1] ("Compl."), ¶ 6.)  Defendant Argentina is the controlling shareholder of Defendant YPF, a publicly-held limited liability stock company organized under the laws of Argentina.  (Compl. ¶¶ 7-8.)

A. Privatization

Until 1993, YPF was an entirely state-owned and state-run enterprise.  (Id. ¶¶ 11-13.)  In the early 1990s, Argentina decided to privatize YPF and, eventually, to sell its shares in an initial public offering ("IPO").  (Id. ¶¶ 12-13.)  As part of this privatization process, Argentina adopted certain provisions in YPF's Bylaws (the "Bylaws"), which took effect in May 1993 and have remained in effect since that date.  (Id. ¶ 16.)

Particularly relevant to the instant action are Sections 7 and 28 of the Bylaws.  Section 7(d) forbids the acquisition of YPF shares if it would cause the acquirer to own more than a stated percentage of YPF's capital stock or Class D shares, unless the acquirer complies with Sections 7(e) and (f) of the Bylaws.  (Bylaws § 7(d).)  These subsections require that the acquirer arrange for a takeover bid of all other YPF shares at a

---

[1] The following facts, which are undisputed except where otherwise indicated, are drawn from the Complaint and the parties' submissions on these motions.

price calculated as provided therein and that a takeover bid
must be conducted in accordance with certain procedures. (Id. §§
7(e)(ii), 7(f)(v).)  These procedures include publication of
notice in New York City and compliance with Securities and
Exchange Commission ("SEC") and New York Stock Exchange ("NYSE")
rules, such as SEC filings detailing the tender offer and
delivery of tender offer materials to the NYSE.  (Id. § 7(f);
Compl. ¶¶ 23, 44.)

Section 28 of the Bylaws extends the takeover bid
requirements of Sections 7(e) and (f) to "all acquisitions made
by the National Government, whether directly or indirectly, by
any means or instrument, of shares or securities of [YPF]" if,
as a consequence of such acquisition, "the National Government
becomes the owner, or exercises the control of, the shares of
[YPF] which, in addition to the prior holdings thereof of any
class of shares, represent, in the aggregate, at least 49% of
the capital stock."  (Id. § 28(A).)

The Bylaws further provide that, if shares are acquired in
breach of the requirements for a takeover bid, the holder of
those shares shall be deprived of voting, dividends, and other
rights corresponding to such shares.  (Id. §§ 7(h).)  These
penalties are extended to acquisitions made by Argentina.  (Id.
§ 28(C)).

After adopting these provisions in YPF's Bylaws, on June 29, 1993, Argentina and YPF launched an IPO of YPF's Class D shares, which were offered on multiple stock exchanges, including the NYSE. (Compl. ¶ 13.) The largest portion of the public offering was in the United States, which generated proceeds of more than $1.1 billion to Argentina as a selling shareholder. (Id.) The offering was registered through registration statements filed with the SEC and effectuated by means of a United States IPO prospectus. (Id.) The prospectus described the tender offer requirement and its applicability to acquisitions made by Argentina, noting that,

> Under the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D shares on terms and conditions specified in the By-laws.

(Id. ¶ 24.)

Following the IPO, YPF was owned, managed, and controlled by private shareholders. (Id. ¶ 7.) YPF's Class D shares were listed and traded in Buenos Aires and in New York as American Depositary Receipts ("ADRs") issued by the Bank of New York Mellon, a New York banking corporation, from its offices in New York City. (Id. ¶¶ 1, 8, 14.) Argentina remained a minority, non-controlling shareholder and continued to participate in YPF's management through a designated representative on YPF's Board of Directors. (Id. ¶¶ 7, 26.)

4

Between 2008 and 2011, Petersen purchased NYSE-listed and
SEC-registered shares of YPF stock amounting to just over 25% of
the company.  (Id. ¶ 6.)  These purchases were financed by two
sets of loans, one by a group of financial institutions and the
other by Repsol YPF, S.A. ("Repsol"), YPF's majority shareholder
at the time.   (Id.)  Both of these loans were secured in part
by Petersen's YPF shares.  (Id.)  Because Petersen intended to
service the interest under those loans using the dividend
payments associated with the acquired stock (id.), Repsol and
Petersen entered into a shareholder's agreement in which Repsol
agreed to cause YPF to distribute dividends twice per year,
amounting to 90% of YPF's profits, and to cause YPF to pay a
single "extraordinary dividend" of $850,000 (id. ¶ 30).
Argentina and YPF were aware of the agreement, which YPF
subsequently described in an SEC filing, and participated in the
agreement's implementation.  (Id. ¶ 30.)

B. Intervention and Expropriation

In late January 2012, the Argentine press began reporting
that Argentina was considering nationalizing YPF.  (Id. ¶ 33.)
In the month following this initial report, the price of YPF's
ADRs dropped by over 20% (id.) and, over the course of a few
months, the price of YPF shares was cut nearly in half (id. ¶¶
33-34).  During this period, Argentine officials made public

statements acknowledging the decline in share price and linking the decline to the public good.  (Id. ¶ 34.)

On April 16, 2012, Argentina announced legislation that would expropriate 51% of YPF's Class D shares.  (Id. ¶ 35.) Also on April 16, 2012, by Emergency Decree No. 530/12, Argentina declared that it would take immediate and complete control of YPF by appointing an "Intervenor" vested with all of the powers of YPF's board of directors and president.  (Id.) That same day, Argentine government officials entered YPF's headquarters, seized control of YPF facilities, and began exercising control of YPF's operations.  (Id. ¶ 36.)  Certain executives, including Sebastian Eskanazi, then-CEO of YPF and an owner of Petersen, were removed from the premises.  (Id.)

On April 17, 2012, Deputy Economy Minister Axel Kicillof, who was appointed Vice-Intervenor in YPF by Emergency Decree No. 532/12, delivered a speech before the Argentine Senate regarding Argentina's takeover of YPF, in which he declared that Argentina and YPF did not intend to issue a tender offer.  (Id. ¶ 38.)

On May 3, 2012, the Argentine Legislature passed Law 26,741, signed May 4, 2012 and effective May 7, 2012, declaring a public need for expropriation of 51% of YPF's shares, which were then owned by Repsol.  (Id. ¶¶ 35, 40; Arg.'s Mem. of Law in Supp. of Mot. to Dismiss, dated Sept. 8, 2015 [dkt. no. 28] ("Arg. Mem. of Law"), at 6.)  Article 9 of Law 26,741 granted

6

the National Executive office authority to "exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed." (Decl. of Martin Domb, dated Sept. 8, 2015 [dkt. no. 27], ("Domb Decl.") Ex. 12 ("Law 26,741") at Art. 9.) According to Argentina, the expropriation was completed in May 2014, at which time Argentina formally acquired and paid Repsol for its shares. (Arg. Mem. of Law [dkt. no. 28] at 6-7.)

### C. Period Following Intervention

The value of YPF shares decreased substantially during the period following the Emergency Decree. (Compl. ¶¶ 6, 37.) On April 23, 2012, YPF did not make an expected dividend distribution to shareholders following the Intervenor's cancellation of a meeting of the YPF Board of Directors. (Id. ¶ 39.) YPF did not hold a shareholder meeting until June 4, 2012 (Def. YPF's Mem. of Law in Supp. of its Mot. to Dismiss [dkt. no. 33] ("YPF Mem. of Law"), at 24) and did not issue a dividend until November 2012 (Compl. ¶ 39). Argentina voted in the June 4, 2012 meeting. (YPF Mem. of Law [dkt. no. 33] at 24.)

In May 2012, after Petersen defaulted on its loan obligations, Petersen's institutional lenders foreclosed on Petersen's Class D shares of YPF. (Compl. ¶¶ 6, 42.) In July 2012, Petersen entered into insolvency proceedings in Spain, and

it is currently undergoing liquidation in an effort to satisfy
its outstanding creditor claims.  (Id. ¶¶ 6, 46.)  In November
2014, a Spanish Bankruptcy Court approved a plan to liquidate
Petersen.  (Id. ¶ 46.)  That plan contemplated sale of
indemnification rights for €15 million or for a lower price
combined with a percentage of the total amount obtained from a
lawsuit against Argentina.  (Domb Decl., Ex. 15 pt. 1 at 11-12.)

  In accordance with the liquidation plan, Petersen's
bankruptcy administrator entered into an agreement on behalf of
Petersen with Prospect Investments LLC ("Prospect"), a Delaware
limited liability company and a wholly owned subsidiary of
Burford Capital LLC ("Burford"), to provide financing for
Petersen's claims in the instant case.  (Compl. ¶ 47.)  The
agreement stated, in relevant part, that "nothing in this
Agreement shall be interpreted to constitute an assignment or
transfer by the Counterparty of the Claims."  (Domb Decl. Ex. 16
pt. 1 at ¶ 2.2.)  Under the agreement, Prospect made an initial,
non-refundable payment to Petersen in the amount of €15,101,000
(id. at ¶ 2.1) and agreed Petersen would receive 30% of the
total amount obtained in the lawsuit (id. at ¶ 3.1).  Petersen
granted Prospect an irrevocable power of attorney in this matter
(id. at annex III), with Prospect to fund all litigation (id. at
¶ 2.3), and Petersen to "not take actions in connection with the
Claims absent the direction of" Prospect (id.) and to

"reasonably defer" to Prospect "in selecting the course of
action that is best for" both parties (id. at ¶ 4.3(c)).

Plaintiffs are represented in this matter by King &
Spalding LLP ("K&S"). According to Plaintiffs, on September 14,
2015, Argentina announced the initiation of criminal proceedings
against K&S and Burford, alleging that they had defrauded
Argentina by participating in an arbitration on behalf of
international investors whose interest in two Argentine airlines
was expropriated by Argentina. (Pl's Mem. of Law in Opp'n to
Arg.'s Mot. to Dismiss, dated Oct. 19, 2015 [dkt. no. 44] ("Pl.
Opp'n to Arg."), at 2, 9; see also Decl. of Derek T. Ho, dated
Oct. 19, 2015 [dkt. no. 45], Ex. A.) Argentina's Attorney
General indicated that the instant case raised similar concerns.
(Id.) At oral argument on Defendants' motions to dismiss,
Argentina asserted that "whatever investigation may be taking
place is not public . . . . What I have been told is that the
attorney general has never included King & Spalding in her
allegations" and that "[n]o charges have been brought . . . .
At most, there was an accusation." (Tr. of Oral Arg., dated
July 20, 2016 ("Tr."), at 59:10-14, 61:1-2.) Plaintiffs
responded that K&S staff had attended a proceeding in Argentina
where "[n]ames were taken down, and every one of those people,
including paralegals . . . were told they were the subject of
criminal investigation . . . in Argentina." (Id. at 61:24-62:2.)

## II. DISCUSSION

Argentina moves for an order dismissing the claims alleged against it (1) pursuant to Fed. R. of Civ. P. ("Rule") 12(b)(1) and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, for lack of subject-matter jurisdiction, and accordingly, pursuant to Fed. R. Civ. P. ("Rule") 12(b)(2) and the FSIA, for lack of personal jurisdiction; (2) under the act of state doctrine; (3) on the ground that this action violates New York's champerty statute, N.Y. Judiciary Law § 489; (4) under the doctrine of forum non conveniens; and (5) pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6) for failure to state a claim.

YPF moves for an order dismissing the claims alleged against it (1) pursuant to Rule 12(b)(1) and the FSIA; (2) under the act of state doctrine; (3) on the ground that Plaintiffs lack standing prior to recognition of the Spanish bankruptcy proceeding in United States courts under Chapter 15 of the Bankruptcy Code; and (4) pursuant to Rule 12(b)(6) for failure to state a claim.

### A. FSIA

"The FSIA is the sole source for subject matter jurisdiction over any action against a foreign state." Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 153 (2d Cir. 2007) (quoting Cabiri v. Gov't of the Republic of Ghana, 165 F.3d 193,

196 (2d Cir. 1999)) (internal quotation marks omitted).  Under

the FSIA, a foreign state[2] is immune from the jurisdiction of the

courts of the United States unless one of several statutorily

defined exceptions applies.  See Republic of Argentina v.

Weltover, Inc., 504 U.S. 607, 610-11 (1992); see also Verlinden

B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 485 n.5 (1983)

("[I]f none of the exceptions to sovereign immunity set forth in

the Act applies, the District Court lacks both statutory subject

matter jurisdiction and personal jurisdiction.").

    In deciding a challenge to jurisdiction under the FSIA, a

"court must look at the substance of the allegations to

determine whether one of the exceptions to the FSIA's general

exclusion of jurisdiction over foreign sovereigns applies."

Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001)

(internal quotation marks and citation omitted).  In doing so,

the court "must review the pleadings and any evidence before it

. . . including affidavits" in order to resolve factual

disputes.  Id. at 140-41 (citation omitted).

---

[2] For the purposes of the FSIA, a "foreign state" includes
"a political subdivision of a foreign state or an agency or
instrumentality of a foreign state."  Kensington, 505 F.3d
at 153 (2d Cir. 2007) (citing 28 U.S.C. § 1603(a)).
"[I]nstrumentality status is determined at the time of the
filing of the complaint."  Dole Food Co. v. Patrickson, 538
U.S. 468, 480 (2003).  Plaintiffs do not dispute that
Defendants are foreign states within the meaning of the
FSIA.  (Compl. ¶¶ 7-8.)

Plaintiffs contend that this action falls within the FSIA's commercial-activity exception, which provides that a foreign state is not immune from suit in any case:

> [I]n which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

§ 1605(a)(2).  This exception applies if the plaintiff shows that any one of these three conditions is met.  See Kensington, 505 F.3d at 154.  In the instant case, Plaintiffs rely on the first and third clauses to argue that Defendants are not immune from this Court's jurisdiction.  (See Pl. Opp'n to Arg. [dkt. no. 44] at 10-22.)  Because this Court agrees that the third clause applies to the instant case, Plaintiffs' arguments regarding the first clause are not addressed here.

Under the third clause of the commercial-activity exception, this Court has jurisdiction if the claim is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of Argentina outside this country; and (3) that 'cause[d] a direct effect in the United States.'"  Weltover, 504 U.S. at 611 (alterations in original) (quoting 28 U.S.C. § 1605(a)(2)).  All three factors are met in the instant case.

1. Plaintiffs' Claims are Based Upon Acts Outside of
   the United States

First, Plaintiffs' claims are based on acts outside the
territory of the United States.  See 28 U.S.C. § 1605(a)(2).  "As a
threshold step in assessing plaintiffs' reliance on the
'commercial activity' exception, [a court] must identify the act
of the foreign sovereign State that serves as the basis for
plaintiffs' claims."  Garb v. Republic of Poland, 440 F.3d 579,
586 (2d Cir. 2006).  A claim "is 'based upon' the 'particular
conduct' that constitutes the 'gravamen' of the suit."
Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC,
813 F.3d 98, 107 (2d Cir. 2016) (quoting OBB Personenverkehr AG
v. Sachs, 136 S.Ct. 390, 396 (2015)).

Defendants argue that the instant claim is "based upon"
Argentina's sovereign acts of intervention and expropriation.
(Arg. Mem. of Law [dkt. no. 28] at 11-14; YPF Mem. of Law [dkt.
no. 33] at 7-8.)  However, the particular conduct that
constitutes the gravamen of the Complaint is Argentina's failure
to issue a tender offer and YPF's failure to enforce the tender
offer requirements that are contained in the Bylaws.  The
Complaint alleges a breach of contract[3] and concerns the effects

---

[3] "[A] company's . . . bylaws in substance are a contract
between the corporation and its shareholders and among the
shareholders."  M+J Savitt, Inc. v. Savitt, No. 08 CIV.
8535 (DLC), 2009 WL 691278, at *9 (S.D.N.Y. Mar. 17, 2009).

of sovereign acts on commercial obligations rather than the sovereign acts themselves.

Additionally, as is required under the relevant FSIA exception, the disputed acts took place outside the United States.  In the FSIA context, "[t]he decision by a foreign sovereign not to perform [a contractual obligation] is itself an act . . . in the foreign state."  Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 76 (2d Cir. 2010) (discussing immunity under third clause of commercial activity exception). Accordingly, the decisions not to make a tender offer or enforce the tender offer requirements occurred in Argentina.  Further, Argentina exercised shareholder rights associated with its shares, including voting, which took place in Argentina. Plaintiffs' claim, therefore, is "based . . . upon an act outside the territory of the United States."  See 28 U.S.C. § 1605(a)(2).

### 2. Defendants' Acts Were Taken in Connection with Commercial Activity

Second, these acts were taken in connection with commercial activity.  See id.  An act "in connection with commercial activity" is one with "a substantive connection or a causal link" with commercial activity.  Hanil Bank v. PT. Bank Negara Indon., 148 F.3d 127, 131 (2d Cir. 1998) (internal quotation marks omitted).  The FSIA defines "commercial activity" as

"either a regular course of commercial conduct or a particular
commercial transaction or act," with the "commercial character"
of such activity to be determined by reference to its "nature
. . . rather than by reference to its purpose."  28 U.S.C. §
1603(d).  Under the FSIA, a foreign state engages in commercial
activity "where it acts in the manner of a private player within
the market" and "exercises only those powers that can also be
exercised by private citizens, as distinct from those powers
peculiar to sovereigns."  Saudi Arabia v. Nelson, 507 U.S. 349,
360 (1993) (internal quotation marks and citation omitted).

Applying this standard, entering into or repudiating a
contract falls within the commercial activity exception.  See De
Csepel v. Republic of Hungary, 714 F.3d 591, 599 (D.C. Cir.
2013) ("[A] foreign state's repudiation of a contract is
precisely the type of activity in which a private player within
the market engages." (internal quotation marks omitted)); see
also Guevara v. Republic of Peru, 468 F.3d 1289, 1229 (11th Cir.
2006) (noting that FSIA permits litigants to "use the courts of
this country to compel [a foreign state] to keep its contractual
promise" where "[t]he underlying activity at issue . . . is
commercial in nature and of the type negotiable among private
parties." (internal quotation marks omitted)).

Further, although "[e]xpropriation is a decidedly
sovereign-rather than commercial-activity," Garb, 440 F.3d at

586, claims closely related to expropriation may nonetheless be
based on commercial activity.  For example, claims arising out
of subsequent commercial activity involving expropriated
property may fall within the commercial activity exception.  See
Smith Rocke Ltd. v. Republica Bolivariana de Venezuela, No. 12
CV. 7316 LGS, 2014 WL 288705, at *5 (S.D.N.Y. Jan. 27, 2014)
("If an expropriated bank, operated by a sovereign, repudiated
loans in its function as an operating bank . . . the commercial
activity exception would apply, as the claim would be based on
the commercial activity, and relief could be granted solely upon
the breach of contract.").  Similarly, claims arising out of a
contract that is conditioned on a sovereign action may fall
within the commercial-activity exception.  See Guevara, 468 F.3d
at 1300 (noting contract for purchase of bullets conditioned on
declaration of war falls within commercial activity exception
because "the condition precedent of a declaration of war speaks
to the purpose or motivation for buying the bullets, but it does
not change the commercial nature of the acts of purchasing and
paying for them").

In this case, once Argentina expropriated the YPF shares,
it assumed certain contractual obligations in the Bylaws.
Section 28 of the Bylaws state that "all acquisitions made by
the National Government, whether directly or indirectly, by any
means or instrument, of shares or securities of [YPF]" that

16

result in Argentina's acquiring a specified percentage of shares
must comply with the takeover bid requirements. (Bylaws § 28(A)
(emphasis added).) By entering into and repudiating contractual
obligations—even ones acquired by sovereign acts—Defendants
acted as ordinary market players and engaged in commercial
activity. See Guevara, 468 F.3d at 1300. Expropriation is
merely the method by which Argentina acquired the shares (a
method fully anticipated by Section 28 of the Bylaws). The
commercial contractual obligations at issue here could just as
easily have been triggered by Argentina's acquisition of a
controlling stake in YPF in open-market transactions. Thus, the
FSIA permits this Court to inquire into the effects of sovereign
acts on otherwise commercial obligations.

### 3. Defendants' Acts Caused a Direct Effect in the United States

Third, Defendants' acts caused a "direct effect in the
United States." See 28 U.S.C. § 1605(a)(2). "In order to be
direct, an effect need not be substantial or foreseeable, but
rather must simply follow as an immediate consequence of the
defendant's . . . activity." Atlantica Holdings, 813 F.3d at
108 (quoting Weltover, 504 U.S. at 618) (internal quotation
marks omitted)); see also I.T. Consultants, Inc. v. Republic of
Pakistan, 351 F.3d 1184, 1190 (D.C. Cir. 2003) (Roberts, C.J.)
("Neither Weltover nor the subsequent case law of this circuit

17

suggests that only 'important' contractual terms may give rise
to a direct effect.").  A consequence is "immediate" where there
is no "intervening element" "between the foreign state's
commercial activity and the effect."  Guirlando, 602 F.3d at 74-
75 (quoting Weltover 941 F.2d at 152)).

As is relevant here, "courts have consistently held that,
in contract cases, a breach of a contractual duty causes a
direct effect in the United States sufficient to confer FSIA
jurisdiction so long as the United States is the place of
performance for the breached duty."  Atlantica Holdings, 813
F.3d at 108-09.  There is a direct effect on the place of
performance even where the plaintiffs are all foreign
corporations, see Weltover, 504 U.S. at 619, and where effects
are also felt elsewhere, see Hanil Bank, 148 F.3d at 133 (noting
United States "need not be the location where the most direct
effect is felt, simply a direct effect" to confer FSIA
jurisdiction).

Here, the United States was the place of performance for
certain contractual obligations under the Bylaws required to
implement a tender offer, including the publication of the
tender offer notices in New York, SEC filings detailing the
tender offer, the delivery of tender offer materials to the
NYSE, and, if demanded, the purchase of shares held in the
United States.  (See Compl. ¶¶ 23, 44; Bylaws § 7(f).)

18

Defendants' failure to perform these contractual obligations necessarily had an immediate and direct effect in the United States.  See Weltover, 504 U.S. at 619 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States.")

Accordingly, for the reasons stated above, Plaintiffs' claims fall within the third clause of the FSIA's commercial activity exception, and, therefore, Defendants' motion to dismiss on the basis of lack of subject matter and personal jurisdiction is denied.

### B. Act of State Doctrine

Defendants also argue that the act of state doctrine bars consideration of Plaintiffs' claims.  (Arg. Mem. of Law [dkt. no. 28] at 18-21; YPF Mem. of Law [dkt. no. 33] at 13-15.) Under this doctrine, "the courts of one state will not question the validity of public acts (acts jure imperii) performed by other sovereigns within their own borders."  Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004); see also Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521 (2d Cir. 1985) ("If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act.").

Unlike an assertion of foreign immunity, the act of state doctrine is not a jurisdictional defense but rather a substantive defense on the merits that "requires courts to accept, as a rule for their decision, that the acts of foreign sovereigns taken within the foreign borders are valid." Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004), opinion clarified on denial of reconsideration, No. 02 CIV. 6356 (SHS), 2005 WL 2585227 (S.D.N.Y. Oct. 13, 2005). "Although . . . the act of state doctrine is an affirmative defense as to which the [defendant] ha[s] the burden, a court may properly grant a motion to dismiss on the basis of that doctrine when its applicability is shown on the face of the complaint." Konowaloff v. Metro. Museum of Art, 702 F.3d 140, 146 (2d Cir. 2012); Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1534 (D.C. Cir. 1984) (Before granting a motion to dismiss based on the act of state doctrine, "the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state").

Act of state issues arise when the outcome of a case turns upon a court's decision regarding the validity of a public act of a foreign sovereign within its territory. See W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 406 (1990) ("Act of state issues only arise when a court

must decide—that is, when the outcome of the case turns upon—the
effect of official action by a foreign sovereign."). This
doctrine may be applied even if the effects of the foreign
sovereign's acts within its own territory are also felt in the
United States. See Spectrum Stores, Inc. v. Citgo Petroleum
Corp., 632 F.3d 938, 955 (5th Cir. 2011). The doctrine does
not, however, apply to the purely commercial conduct of a
foreign sovereign. See Alfred Dunhill of London, Inc. v.
Republic of Cuba, 425 U.S. 682, 695 (1976) ("[T]he concept of an
act of state should not be extended to include the repudiation
of a purely commercial obligation owed by a foreign sovereign or
by one of its commercial instrumentalities."). It also permits
adjudication of cases concerning the commercial consequences of
sovereign action. See, e.g., Lyondell-Citgo Ref., LP v.
Petroleos de Venezuela, S.A., No. 02 CIV. 0795 (CBM), 2003 WL
21878798, at *8 (S.D.N.Y. Aug. 8, 2003) (finding act of state
doctrine inapplicable in action concerning whether an official
act constitutes force majeure under the terms of a contract).

Defendants rely on Braka v. Bancomer, S.N.C., 762 F.2d 222
(2d Cir. 1985), to argue that the act of state doctrine bars
judicial review of contractual claims arising out of a foreign
sovereign's expropriation within its own territory. (See YPF
Mem. of Law [dkt. no. 33] at 13-15; Arg. Mem. of Law [dkt. no.
28] at 19-21.) In Braka, several United States citizens

21

purchased peso- and dollar-denominated certificates of deposits ("CDs") from a private Mexican bank.  726 F.2d at 223.  After these purchases were made, the Mexican government issued a series of decrees, nationalizing Mexico's banks and mandating that all deposits be repaid in Mexican pesos at a specified rate of exchange.  Id.  The purchasers of the CDs filed suit against the Mexican bank in federal district court in New York, alleging breach of contract and seeking compensation for damages that resulted from the bank's payment of their CDs at the exchange rates prescribed by the Mexican government instead of at the market exchange rate.  Id.  The Court of Appeals held that the act of state doctrine barred Plaintiffs' claims because "the situs of defendant's obligation existed wholly within the boundaries of the foreign sovereign" and, "[w]ere we to issue the order [plaintiffs] seek, we would find ourselves directing a state-owned entity to violate its own national law with respect to an obligation wholly controlled by Mexican law."  Id. at 225.  This case is inapposite to the instant action, however, because Defendants have not shown that performance of the alleged obligations would constitute a violation of Argentine law.

Indeed, as described earlier, the outcome of this case does not turn on the validity of Argentina's official acts but rather on the operation of YPF's Bylaws in light of those acts.  For the following reasons, it does not appear from the face of the

22

Complaint that Defendants' failure to comply with or enforce

those Bylaws either constituted an official act or was compelled

by an official act.  See Konowaloff, 702 F.3d at 146.

First, the expropriation and intervention laws did not

explicitly preclude tendering for shares.  Law 26,741 stated a

public need to expropriate 51% of YPF shares.  (Law 26,741 [dkt.

no. 27-12] at Art. 7.)  The law did not address the acquisition

of additional shares in the marketplace, including by tender

offer.  (Id.)  Accordingly, the tender offer provisions of

Bylaws §§ 7(e), (f) and 28 are not necessarily inconsistent with

the sovereign act of expropriation.

Second, the expropriation law provided that Argentina would

"exercise all political rights associated with the shares

subject to expropriation" until the transfer of rights was

completed.  (Id. at Art. 9.)  This provision placed Argentina in

the position of Repsol with respect to the shares subject to

expropriation, leaving commercial rights and obligations intact,

including Bylaw § 7(h), which prohibited exercise of certain

rights associated with shares acquired in breach of the tender

offer requirement.  Therefore, it does not appear from the face

of the Complaint that Bylaw § 7(h) was inconsistent with

Argentina's sovereign acts.

Accordingly, performance under the contract by both

Argentina and YPF does not appear to be inconsistent with

Argentina's official actions, and therefore the outcome of this action does not "turn on" a determination regarding the validity of an official act.  Although the act of state doctrine requires that this Court proceed under the assumption that the intervention and expropriation in Argentina were valid acts, it does not preclude inquiry into contractual obligations related to or arising out of those acts.  Because this assumption of validity does not compel a finding for the Defendants, and because the Court does not have to inquire into the validity of the sovereign acts of intervention and expropriation, dismissal under the act of state doctrine is not warranted.  Thus, Defendants' motion to dismiss on this ground is denied.

### C. Identity of Party Bringing Suit in this Action

Although the two Petersen entities are the named plaintiffs in this action, a factual dispute exists concerning whether the action is brought on Petersen's behalf by its bankruptcy receiver or whether these claims have been assigned to Prospect. If the suit is brought by Prospect, Argentina argues the claim should be dismissed for violation of the New York champerty statute (see Arg. Mem. of Law [dkt. no. 28] at 22-25); if brought by Petersen's receiver, YPF argues the receiver lacks standing under Chapter 15 of the United States Bankruptcy Code (see YPF Mem. of Law [dkt. no. 33] at 15-18).

24

1. <u>New York Champerty Statute</u>

Although Petersen is the named Plaintiff in the instant action, Argentina claims that Petersen's receiver sold its interest in this lawsuit to Prospect and that the suit should be dismissed because this arrangement violates New York's champerty statute.  (Arg. Mem. of Law [dkt. no. 28] at 22-25.)  Petersen, in turn, disputes the existence of an assignment and argues, in the alternative, that such an assignment would fall within an exception to the statute.  (Pl. Opp'n to Arg. [dkt. no. 44] at 25-28.)  As is explained below, Argentina's motion to dismiss on this basis is denied.

Under New York's champerty statute, it is prohibited to "solicit, buy or take an assignment of . . . [a] thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon," with the exception that "things in action may be solicited, bought, or assignment thereof taken, from any . . . receiver in bankruptcy."  N.Y. Judiciary Law § 489(1).  A claim acquired in violation of this statute may not be enforced by the assignee. See <u>Elliott Associates, L.P. v. Republic of Peru</u>, 948 F. Supp. 1203, 1208 (S.D.N.Y. 1996).  Champerty is an affirmative defense, and a motion to dismiss will be granted on this basis only if the facts establishing the defense are shown in the complaint, documents attached to the complaint, and matters of

which the Court may take judicial notice. See CIBC Bank & Trust
Co. (Cayman) v. Banco Cent. do Brasil, 886 F. Supp. 1105, 1108
(S.D.N.Y. 1995).

The champerty law is intended to "prevent[] the strife,
discord and harassment that would be likely to ensue from
permitting attorneys and corporations to purchase claims for the
purpose of bringing actions thereon." Trust For the Certificate
Holders of Merrill Lynch Mortgage Inv'rs, Inc. v. Love Funding
Corp., 918 N.E.2d 889, 893 (2009) ("Love Funding") (internal
quotation marks omitted). Accordingly, "violation of Section
489 turns on whether 'the primary purpose of the purchase [was]
. . . to bring a suit,' or whether 'the intent to bring a suit
[was] . . . merely incidental and contingent.'" Elliott
Associates, L.P. v. Banco de la Nacion, 194 F.3d 363, 378 (2d
Cir. 1999) (quoting Moses v. McDivitt, 88 N.Y. 62, 65 (1882)).
"[T]he champerty statute does not apply when the purpose of an
assignment is the collection of a legitimate claim." Love
Funding, 918 N.E.2d at 895. Although this inquiry into intent
is "decidedly fact-specific," courts have granted motions to
dismiss on the basis of assignments violating the New York
champerty statute. See CIBC Bank & Trust Co. (Cayman), 886 F.
Supp. at 1111.

Here, the facts sufficient to establish a champertous
assignment are not clear from the face of the Complaint. See

id., 886 F. Supp. at 1108.  Far from conceding that Prospect acquired the rights to Plaintiffs' claims for the purpose of profiting from the litigation rather than collecting a legitimate claim, Plaintiffs dispute that the claim was assigned and assert that the instant action was brought by Petersen's receiver.  (See Compl. ¶¶ 6, 47.)  Plaintiffs allege that, in accordance with the liquidation plan approved by the Spanish bankruptcy court, the bankruptcy administrator entered into an agreement on behalf of Petersen with Prospect "to provide financing for Petersen's claims."  (Id. ¶ 47.)  The relevant agreement, which is incorporated by reference in the Complaint, states that, "[t]he parties agree that nothing in this Agreement shall be interpreted to constitute an assignment . . . of the Claims," (Domb Decl. Ex. 16 pt. 2 at 1) and that Petersen retains an interest in the outcome of the case, (see id. at ¶ 3.1).

Further, even if facts sufficient to establish an assignment were present, the arrangement would fall within the bankruptcy exception of the New York champerty statute, see N.Y. Judiciary Law § 489(1), as the relevant agreement was made between Prospect and Petersen's receiver in bankruptcy.  (Id. ¶ 47.)  Argentina's motion to dismiss on this basis is therefore denied.

## 2. Chapter 15 of the U.S. Bankruptcy Code

If, as Plaintiffs contend, the claim is brought by Petersen's receiver, YPF argues that the claim should be dismissed for lack of standing because the receiver in Plaintiffs' Spanish bankruptcy proceeding did not first obtain recognition for the foreign insolvency proceedings by United States courts pursuant to Chapter 15 of the U.S. Bankruptcy Code. (YPF Mem. of Law [dkt. no. 33] at 15-18.) The motion to dismiss on this ground is also denied, however, because the instant matter falls within an exception to the Chapter 15 recognition requirement.

Under Chapter 15, a "foreign representative" must obtain recognition of a foreign proceeding pursuant to 11 U.S.C. § 1517 prior to "apply[ing] directly to a court in the United States" and before "a court in the United States shall grant comity or cooperation to the foreign representative." See Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd., No. 09 CIV. 9021 (PGG), 2010 WL 1779282, at *4 (S.D.N.Y. Apr. 29, 2010) (quoting 11 U.S.C. § 1509(a), (b)(2), (b)(3)). However, § 1509(f) establishes an exception to this requirement, providing that a foreign representative's failure to obtain recognition "does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor." 11 U.S.C. § 1509(f).

The legislative history of § 1509(f) indicates that it is intended to be a "limited exception" and provides an "account receivable" as an example of "a claim which is property of the debtor." H.R. REP. 109-31, pt. 1, at 110-11 (2005). The exception, however, encompasses those claims of the debtor that existed prior to the bankruptcy or are independent of the bankruptcy and that, therefore, do not involve the cooperation and comity of United States courts with a foreign bankruptcy proceeding. See In re Fairfield Sentry Ltd. Litig., 458 B.R. 665, 684 (S.D.N.Y. 2011) (where a claim is "independent" of the bankruptcy because the redemptions at issue preceded it, "[h]ad the foreign representatives declined to file a Chapter 15 case, that choice also would not have limited the foreign representatives' ability to pursue their claims in the United States" under § 1509(f)); see also Varga v. McGraw Hill Financial Inc., No. 652410/2013, 2015 WL 4627748, at *13 (N.Y. Sup. Ct. July 31, 2015) (lack of Chapter 15 recognition did not affect standing in a fraud case because "Plaintiffs . . . did not bring this case with the express purpose of assisting or facilitating their insolvency proceedings. . . .").

Here, Plaintiffs are not requesting comity or cooperation from this Court with respect to their foreign insolvency proceedings. Rather, Plaintiffs are seeking to recover on a claim that is independent from the insolvency proceedings and

that is property of their receivership.  See Varga, 2015 WL
4627748, at *13.  As such, prior recognition of the Spanish
bankruptcy proceeding is not necessary to confer standing on the
Plaintiffs' foreign representative.  The motion to dismiss for
lack of standing is therefore denied.

### D. Forum Non Conveniens

Argentina also moves for dismissal on the basis of the
doctrine of forum non conveniens, which provides courts
discretion to decline to exercise jurisdiction "whenever it
appears that such [a] case may be more appropriately tried in
another forum, either for the convenience of the parties or to
serve the ends of justice."  Pollux Holding Ltd. v. Chase
Manhattan Bank, 329 F.3d 64, 67 (2d Cir. 2003).  District courts
are permitted to consider and credit any evidence in the record,
including affidavits, when ruling on motions to dismiss for
forum non conveniens.  Alcoa S. S. Co. v. M/V Nordic Regent, 654
F.2d 147, 149 (2d Cir. 1980).

In evaluating a motion to dismiss for forum non conveniens,
a court must determine: (1) the degree of deference owed to the
plaintiff's choice of forum, (2) whether the defendant's
proposed forum is adequate, and (3) if an adequate alternative
forum exists, whether the balance of private and public interest
weighs in favor of the alternative forum.  See Pollux, 329 F.3d

at 70.  A defendant moving for dismissal on this basis bears the burden of proof and must demonstrate "that an adequate alternative forum exists and that, considering the relevant private and public interest factors[,] . . . the balance of convenience tilts strongly in favor of trial in the foreign forum."  R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991).

In the instant case, deference to Plaintiffs' choice of forum is not at its greatest height.  Although "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum . . . the presumption applies with less force when the plaintiff or real parties in interest are foreign."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981).  Here, the forum is not home to Defendants, Plaintiffs, or Plaintiffs' owners or receiver.  (Compl. ¶¶ 6, 7, 8, 46; Arg. Mem. of Law [dkt. no. 28] at 4.)

Nonetheless, Defendants have not shown that Argentina is an adequate alternative forum for resolution of the instant controversy.  See R. Maganlal & Co., 942 F.2d at 167.  In general, "[a]n alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  Pollux, 329 F.3d at 75.  An alternative forum meeting these requirements may be found inadequate, however, "[i]n rare circumstances . . .

where the remedy offered by the other forum is clearly

unsatisfactory." Piper Aircraft, 454 at 255 n.22.

Courts generally have found Argentina to be an adequate

alternative forum. See, e.g., Satz v. McDonnell Douglas Corp.,

244 F.3d 1279, 1283 (11th Cir. 2001) ("The plaintiffs' concerns

about Argentine filing fees, the lack of discovery in Argentine

courts, and their fear of delays in the Argentine courts do not

render Argentina an inadequate forum."); Warter v. Boston Sec.,

S.A., 380 F. Supp. 2d 1299, 1311 (S.D. Fla. 2004) (collecting

cases finding Argentina an adequate forum); MasterCard Int'l

Inc. v. Argencard Sociedad Anonima, No. 01 CIV. 3027 (JGK), 2002

WL 432379, at *7 (S.D.N.Y. Mar. 20, 2002) (finding Argentina an

adequate forum but denying motion on other grounds).  However,

this determination has not been universal, including where

Argentina is itself a party. See Weltover, Inc. v. Republic of

Argentina, 753 F. Supp. 1201, 1209 (S.D.N.Y.), aff'd, 941 F.2d

145 (2d Cir. 1991), aff'd, 504 U.S. 607 (1992) (declining to

find Argentina an adequate alternative forum).

Plaintiffs argue that Argentina is an inadequate forum for

the instant action because of the Argentine government's threats

of criminal prosecution against K&S and Burford, prohibitive

court fees and awards, frequent delay and insufficient process,

and lack of judicial independence.  (Pl. Opp'n to Arg. [dkt. no.

44] at 29-31.)  Plaintiffs' concerns regarding fees, delay,

process, and judicial independence have not prevented other courts from finding Argentina an adequate forum. See Warter at 1311. However, the facts as alleged give rise to a well-founded fear of prosecution of parties' counsel if the instant action were brought in Argentina. See Cabiri v. Assasie–Gyimah, 921 F.Supp. 1189, 1199 (S.D.N.Y. 1996) (denying motion to dismiss on forum non conveniens where Ghanian plaintiff had well-founded fear of prosecution if he brought action in Ghanian courts). Plaintiffs also have submitted a partial transcript from a news conference held on September 14, 2015, during which Argentina's former Attorney General stated that K&S and Burford were being accused of unlawful conduct and that a complaint had been filed. (Ho Decl., Ex. A at 3-5.) Argentina did not address these statements made by the former Attorney General or otherwise respond to Plaintiffs' arguments on this matter in its submissions to the Court.

At oral argument on this motion, counsel for Argentina conceded that, in February of 2015, Argentina's then-Attorney General filed a "criminal complaint in connection with [another case] against Burford and some of the principals in that case." (Tr. at 58:22-59:1.) Counsel further stated that "whatever investigation may be taking place is not public" and that "[t]here have been no charges filed to [his] knowledge," but that "there may be an ongoing investigation." (Tr. at 59-61.)

While the particular facts remain in dispute between the parties, Argentina has not met its burden to establish that an adequate alternative forum exists.

Further, Argentina has not shown that the balance of private and public interest factors[4] "tilts strongly in favor of trial in the foreign forum." See R. Maganlal & Co., 942 F.2d at 167; see also Gulf Oil, 330 U.S. at 508 ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). Argentina argues that several private interests—the ability to compel witnesses, the costs of travel, and the inconvenience of translating documents—favor adjudication in Argentina. (Arg. Mem. of Law [dkt. no. 28] at 27.)

However, Defendants have not identified witnesses they would call at trial who would be unwilling to appear. See Metito (Overseas) Ltd. v. Gen. Elec. Co., No. 05 CIV. 9478(GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) (noting "such

---

[4] "The private interests concern the 'practical problems that make trial of a case easy, expeditious and inexpensive' (ease of access to proof, availability of compulsory process, cost of obtaining willing witnesses' attendance), the likelihood of obtaining an enforceable judgment and the 'relative advantages and obstacles to a fair trial.' The public interest factors involved include the problems of court congestion, jury duty, local interest in the controversy and the advantages of having a court familiar with the law which is being applied." Manu Int'l, S.A. v. Avon Products, Inc., 641 F.2d 62, 64-65 (2d Cir. 1981) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947)).

identification is generally required for a forum non conveniens
dismissal") (internal quotation marks and citation omitted); see
also Shtofmakher v. David, No. 14 CIV. 6934 (AT), 2015 WL
5148832, at *3 (S.D.N.Y. Aug. 17, 2015) ("Although . . .
putative witnesses are beyond the Court's subpoena power, there
is no evidence that they would be unwilling to testify, which
renders the lack of a subpoena power a less compelling
consideration.")  Indeed, Argentina conceded at oral argument
that they "have not asked" potential witnesses if they would be
willing to appear.  (Tr. at 64:5-8.)

The costs and inconvenience associated with the potential
witnesses' travel also do not weigh strongly in favor of
dismissal.  Although Argentina asserts that virtually all of the
witnesses to the relevant events reside in Argentina, "modern
technologies . . . make the location of witnesses and evidence
less important to the forum non conveniens analysis."  See
Metito (Overseas) Ltd., 2006 WL 3230301, at *6.  Further, while
travel costs are a "legitimate part of the forum non conveniens
analysis," Defendants have not shown that these costs are
"excessively burdensome."  See Wiwa v. Royal Dutch Petroleum
Co., 226 F.3d 88, 107 (2d Cir. 2000).

Argentina also asserts, and Plaintiffs do not dispute, that
many of the relevant documents are written in Spanish and have
not been translated to English.  (Arg. Mem. of Law [dkt. no. 28]

at 30.)  Although the costs of translating documents may be an
important factor in the Court's forum non conveniens analysis,
it is not a dispositive one in the instant case.  See Varnelo v.
Eastwind Transp. Ltd., No. 02 CIV 2084 (KMW), 2003 WL 230741, at
*2 (S.D.N.Y. Feb. 3, 2003).  Argentina concedes that some of the
relevant documents have been translated already (see Arg. Mem.
of Law [dkt. no. 28] at 30), and the Court finds that the cost
of translating the remaining documents in this case would not be
such an unreasonable burden on the parties that the Plaintiffs'
choice of forum should be disturbed.

Finally, none of the public interest factors in this case
weigh strongly in Defendants' favor and, therefore, on balance
do not warrant dismissal on the basis of forum non conveniens.
In particular, both of the proposed fora appear to have an
interest in adjudicating this dispute.  Additionally, to the
extent the Court must apply Argentine law in reaching a
determination, it is not a justification for dismissal under
forum non conveniens.  See R. Maganlal, 942 F.2d at 169 ("[T]he
need to apply foreign law is not alone sufficient to dismiss
under the doctrine of forum non conveniens.").  The Defendants
have not shown that application of foreign law "would be
unusually difficult or burdensome to this Court."  United
Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216
F. Supp. 2d 198, 209 (S.D.N.Y. 2002).

Accordingly, for the foregoing reasons, Argentina has failed to demonstrate that there would be an adequate alternative forum and that, even if there were, the balance of public and private factors tilts strongly in favor of disturbing the Plaintiffs' choice of forum.  Argentina's motion to dismiss on this basis is, therefore, denied.

### E. Failure to State a Claim

#### 1. Standard of Review

"When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." Galper v. JP Morgan Chase Bank, N.A., 802 F.3d 437, 443 (2d Cir. 2015). Although a complaint is not required to contain "detailed factual allegations," a plaintiff must provide "more than labels and conclusions," such that "[f]actual allegations . . . raise a right to relief above the speculative level," to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents

incorporated in it by reference, and any document upon which the
complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191,
198 (2d Cir. 2014), cert. denied, 135 S. Ct. 715 (2014) (quoting
In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013)).  However,
"[i]n determining foreign law, the court may consider any
relevant material or source . . . whether or not submitted by a
party or admissible under the Federal Rules of Evidence."  Fed.
R. Civ. P. 44.1.  Accordingly, the Court may consider the
parties' expert reports to the extent that those reports assist
the court in determining issues of Argentine law.  See In re
Petrobras Sec. Litig., No. 14-CV-9662 (JSR), 2016 WL 929346, at
*5 n.3 (S.D.N.Y. Mar. 12, 2016).

### 2. Choice of Law

Here, the parties dispute whether Argentine or New York law
applies to this matter.  (See Arg. Mem. of Law [dkt. no. 28] at
32 n.14; YPF Mem. of Law [dkt. no. 33] at 18-21; Pls.' Mem. of
Law in Opp'n to YPF, dated Oct. 23, 2015 [dkt. no. 49] at 20-
21.)  "When subject matter jurisdiction is based on the Foreign
Sovereign Immunities Act (the 'FSIA') . . . [courts in this
circuit] apply the choice-of-law rules of the forum state, here
New York, with respect to all issues governed by state
substantive law."  Bank of New York v. Yugoimport, 745 F.3d 599,
608-09 (2d Cir. 2014).  Where New York choice-of-law rules
apply, courts must first determine whether there is an "actual

conflict" between the proposed laws and, if a conflict exists,
"classify the conflicting laws by subject matter with reference
to New York law." Booking v. Gen. Star Mgmt. Co., 254 F.3d 414,
419-20 (2d Cir. 2001).

"Under New York law, issues relating to the internal
affairs of a corporation are decided in accordance with the law
of the state of incorporation." BBS Norwalk One, Inc. v.
Raccolta, Inc., 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999), aff'd,
205 F.3d 1321 (2d Cir. 2000); see also Winn v. Schafer, 499 F.
Supp. 2d 390, 393 (S.D.N.Y. 2007) (applying New York choice of
law rules, the Cayman Islands law governs claim concerning the
internal affairs of a corporation incorporated in the Cayman
Islands). The internal affairs doctrine generally applies to
breach of contract claims brought by shareholders. See Druck
Corp. v. Macro Fund (U.S.) Ltd., No. 02 CIV. 6164(RO), 2007 WL
258177, at *1 (S.D.N.Y. Jan. 29, 2007), aff'd sub nom. Druck
Corp. v. Macro Fund Ltd., 290 F. App'x 441 (2d Cir. 2008)
(applying law of place of incorporation where shareholders
alleged mishandling of redemption fees by directors constituted
a breach of contract). Therefore, here, the internal affairs
doctrine directs application of Argentine law to Plaintiffs'
breach of contract claims where a conflict between New York and
Argentine law exists.

3. <u>Substantive Claims</u>

a. <u>Breach of Contract by Argentina</u>[5]

Plaintiffs allege that Argentina breached the Bylaws by, among other things, failing to comply with the requirement in Sections 7 and 28 of the Bylaws that any acquisition of a controlling stake in YPF be conditioned on a tender offer for all Class D shares.  (Compl. ¶ 53).  Plaintiffs allege that, as a direct and proximate result of Argentina's breach, (1) the value of Petersen's shares was significantly reduced, (2) Petersen defaulted on its loans, the structure of which was known to Defendants, and (3) because the value of shares was depressed, the foreclosure failed to satisfy Petersen's debts, resulting in Petersen's bankruptcy.  (<u>Id.</u> at ¶ 42.)

Argentina counters that, even if there was an obligation to make a tender offer, Plaintiffs' claim must be dismissed for failure to show causation.  (Arg. Mem. of Law [dkt. no. 28] at 31-35.)  Argentina asserts, and Plaintiffs do not dispute that, under both New York and Argentine law, "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's

---

[5] Plaintiffs also bring a claim for anticipatory breach, alleging that Defendants repudiated their contractual obligations by declaring they would not comply with the Bylaws. (Compl. at ¶¶ 58, 76.)  Plaintiffs' anticipatory breach claims rest on the same facts as the breach of contract claims and, therefore, for the reasons set forth below, this claim also is not dismissed.

breach <u>directly and proximately caused</u> his or her damages."

<u>Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank</u>, 392 F.3d 520, 525

(2d Cir. 2004); <u>see</u> Arg. Mem. of Law [dkt. no. 28] at 32 n.14.

Argentina argues that the timeline alleged in the Complaint establishes that Plaintiffs' claimed losses could not have been caused by Argentina's failure to make a tender offer or any other conduct for which Argentina could be held liable. (Arg. Mem. of Law [dkt. no. 28] at 31.) Relying on its own expert's opinion concerning the timing of a tender offer (Decl. of Javier Errecondo in Supp. of Mot. to Dismiss, dated Sept. 8, 2015 [dkt. no. 26], ¶¶ 13-16), Argentina argues that such an offer would have taken "at least several months" and, therefore, would not have been completed until long after Plaintiff defaulted on its loans (Arg. Mem. of Law [dkt. no. 28] at 34). Instead, according to Argentina, Plaintiffs' alleged harm was caused by events for which Argentina cannot be held liable, such as Argentina's decision to defer a shareholder vote on the anticipated May 2012 dividend payment. (<u>Id.</u> at 32-33.)

Plaintiffs, in turn, counter that Argentina's "competing theory of causation . . . raise[s] factual questions not suitable for resolution on a motion to dismiss." (Pl. Opp'n to Arg. [dkt. no. 44] at 34 (quoting <u>Acticon AG v. China N.E. Petroleum Holdings Ltd.</u>, 692 F.3d 34, 39 (2d Cir. 2012).) Plaintiffs argue that Argentina's timeline is incorrect and

that, based on their own expert's opinion, the tender offer
requirement was triggered in April 2012, when Argentina
reacquired control of YPF. (Id. at 35.) Further, Plaintiffs
argue that it is "unrealistic to think that Petersen's creditors
would have foreclosed based on a technical default had they
known that Petersen would soon receive the tender offer price"
and, even if foreclosure still had occurred, the price
Plaintiffs would have received in a tender offer would have
allowed them to pay off their outstanding loans following
foreclosure. (Id.)

However, this Court cannot consider these experts' opinions
on factual issues on a motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6). Further, the Bylaws do not clearly establish
when a takeover bid would occur or whether Petersen could have
received the tender offer price in time to satisfy its
creditors. Accordingly, accepting the facts alleged in the
Complaint as true and considering those facts in the light most
favorable to the Plaintiff, the complaint sets forth a plausible
basis for relief on this claim. Twombly, 550 U.S. at 555.
Argentina's motion to dismiss Plaintiffs' claim for breach of
contract and anticipatory breach against it is denied.

### b. Breach of Contract by YPF

Plaintiffs also allege that YPF breached the Bylaws by (1)
failing to comply with or enforce the tender offer requirements

of Sections 7 and 28 of the Bylaws; (2) failing to prohibit
Argentina from voting or exercising corporate governance powers
under Section 7(h) of the Bylaws; and (3) failing to distribute
dividends to YPF's shareholders, including Petersen.  (Compl. ¶
71.)  Defendant YPF's motion to dismiss on this basis is also
denied for the reasons stated below.

First, Sections 7 and 28 of the Bylaws plausibly can be
read to impose liability on YPF when shares are acquired in the
triggering amount absent a tender offer.[6]  YPF argues that is not
liable under Argentine law even if its actions constituted a
breach of the Bylaws because a public law, such as the
expropriation law, preempts private contractual obligations and
constitutes an event of force majeure that excuses any alleged
breach.  (YPF Mem. of Law [dkt. no. 33] at 23-24.)  Even if
YPF's characterization of the relevant law is correct, however,
it is not clear from the face of the Complaint that the
obligations imposed on YPF under the Bylaws were inconsistent
with the intervention and expropriation laws.  Second, although

---

[6] These provisions include: "If the terms of subsections e)
and f) of this section are not complied with, it shall be
forbidden to acquire shares or securities of the
Corporation. . . ."  (Bylaws § 7(d)); "Each takeover bid
shall be conducted in accordance with the procedure herein
stipulated. . . ."  (Id. § 7(f)); "The provisions of
subsections e) and f) of Section 7 . . . shall apply to all
acquisitions made by the National Government, whether
directly or indirectly, by any means or instrument, of
shares or securities of the Corporation . . ." (Id. § 28
(A)).

YPF argues that its failure to prevent Argentina from voting did
not necessarily cause Plaintiffs' alleged injury (YPF Mem. of
Law [dkt. no. 33] at 24), this argument relies on facts outside
of the Complaint regarding the timing and conditions of
Petersen's default, which may not be considered on a motion to
dismiss.

Accordingly, Defendant YPF's motion to dismiss Plaintiffs'
claim for breach of contract and anticipatory breach is denied.

### c. Good Faith and Fair Dealing

Plaintiffs further allege that both Defendants breached the
implied obligation of good faith and fair dealing.  However,
"New York law . . . does not recognize a separate cause of
action for breach of the implied covenant of good faith and fair
dealing when a breach of contract claim, based upon the same
facts, is also pled."  Harris v. Provident Life & Acc. Ins. Co.,
310 F.3d 73, 81 (2d Cir. 2002).  Defendant YPF asserts that
Argentine law compels the same result.  (YPF Mem. of Law [dkt.
no. 33] at 25.)

Plaintiffs argue that YPF breached its implied duty of good
faith and fair dealing by, among other things, failing to
enforce or attempt to enforce the tender-offer obligations in
the Bylaws.  (Compl. ¶ 80.)  Plaintiffs' allegations are not
distinct from Plaintiffs' claim for breach of contract against

44

YPF, and, accordingly, Plaintiffs' claim for breach of the
implied duty of good faith and fair dealing against YPF is
dismissed as improperly duplicative.

Similarly, Plaintiffs allege that Argentina breached its
implied duty of good faith and fair dealing by (1) intentionally
breaching the terms of the Bylaws by declining to make a tender
offer and (2) conducting a campaign against YPF shareholders
beginning in January 2012 with the intent and effect to depress
the value of shares and reduce the price of a later tender
offer. (Id. ¶ 62.) Plaintiffs' claim that Argentina
"intentionally" breached the bylaws is improperly duplicative of
Plaintiffs' breach of contract claim and, therefore, is
dismissed. However, Plaintiffs' claim that Argentina engaged in
a campaign to depress share prices, including statements made by
Argentine public officials prior to the alleged breach (id. ¶
33), is sufficiently distinct from Plaintiffs' breach of
contract claim. Accordingly, Plaintiffs' claim with respect to
Argentina is not dismissed on this ground.

### d. Promissory Estoppel

Finally, Plaintiffs allege that Defendants promised that
Argentina would not retake control of YPF without making a
tender offer in its IPO Prospectus, SEC filings, and other
documents, and that Petersen foreseeably and justifiably relied

on that promise.  (Id. ¶¶ 65-67, 83-85).  Under New York law, a promissory estoppel claim should be dismissed as duplicative of a breach of contract claim where the promissory estoppel claim "is based on promises that are consistent with the undertakings contained in the contract." Four Finger Art Factory, Inc. v. Dinicola, No. 99 CIV. 1259 (JGK), 2000 WL 145466, at *8 (S.D.N.Y. Feb. 9, 2000).  Further, although Plaintiffs assert that Argentine law "recognizes promissory estoppel," Plaintiffs' own expert acknowledges that, in Argentina, "the doctrine of estoppel is not an autonomous source of obligation."  (See Pl. Opp'n to YPF [dkt. no. 49] at 21 (citing Decl. of Alberto B. Bianchi, dated Oct. 91, 2015 [dkt. no. 47] at ¶¶ 92-93 (emphasis added)).)  Plaintiffs have not identified a promise made in the IPO Prospectus, SEC filings, or elsewhere that is distinct from the obligations imposed by the Bylaws.  Accordingly, Plaintiffs' promissory estoppel claims are dismissed as improperly duplicative of the breach of contract claims.

III. Conclusion

For the above reasons, Defendants' motions to dismiss (Arg.
Mot. to Dismiss, dated Sept. 8, 2015 [dkt. no. 23]; YPF Mot. to
Dismiss, dated Sept. 8, 2015 [dkt. no. 32]) are granted in part
and denied in part. Specifically, the motions to dismiss the
promissory estoppel claims against both Defendants are granted;
the motion to dismiss the good faith and fair dealing claim
against YPF is granted but denied as to Argentina. These
motions are denied in all other respects.


SO ORDERED.


Dated:      New York, New York
            September _9_, 2016

                                     _Loretta A. Presla_
                                     LORETTA A. PRESKA
                                     United States District Judge