# 23-7370(L)

## 23-7463(XAP), 23-7614(XAP)

# In the United States Court of Appeals for the Second Circuit

———————————

PETERSEN ENERGIA INVERSORA S.A.U. and PETERSEN ENERGIA S.A.U.,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant-Cross-Appellee*,

YPF, S.A.,
*Defendant-Conditional Cross-Appellant*.

———————————

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

———————————

## PAGE-PROOF RESPONSE-AND-REPLY BRIEF FOR DEFENDANT-APPELLANT-CROSS APPELLEE THE ARGENTINE REPUBLIC

———————————

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio Galvis
Adam R. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

# TABLE OF CONTENTS

*Page*

**INTRODUCTION AND SUMMARY OF ARGUMENT** ....................................1

**ARGUMENT** ..................................................................................................6

**I.**     **PLAINTIFFS' CLAIMS NEVER BELONGED IN A U.S. COURT** ...........................................................................................6

     A.    The District Court Committed Multiple Legal Errors in Not Dismissing These Cases on *Forum Non Conveniens* Grounds............6

     B.    The District Court Committed Legal Error in Not Dismissing Under the International-Comity Doctrine ...........................................14

**II.**    **PLAINTIFFS' CLAIMS FAIL UNDER GOVERNING ARGENTINE LAW** ...............................................................................18

     A.    Argentine Law Has Never Recognized Plaintiffs' Unprecedented "Breach of Contract" Claims .....................................19

     B.    Damages Are Otherwise Unavailable Under Governing Argentine Law ........................................................................................28

         1.    The YPF Bylaws' penalties are an exclusive remedy .............29

         2.    Argentine law required plaintiffs to seek specific performance before damages ....................................................32

     C.    Plaintiffs Were No Longer Shareholders When the Supposed Breach Occurred....................................................................................37

     D.    Argentina's General Expropriation Law Forecloses Plaintiffs' Claims.......................................................................................................40

**III.**   **AT A MINIMUM, PLAINTIFFS' DAMAGES MUST BE RECALCULATED**.........................................................................................45

      A.     Plaintiffs Cannot Escape New York's Judgment-Day Rule ...............46

      B.     The District Court Applied the Wrong Breach Date and Prejudgment Interest Rate ....................................................................52

**IV.   IN THEIR CROSS-APPEAL, PLAINTIFFS CANNOT RESUSCITATE THEIR LEGALLY FLAWED CLAIM FOR PROMISSORY ESTOPPEL** ........................................................55

**CONCLUSION**.................................................................................................59

# TABLE OF AUTHORITIES

*Page(s)*

**U.S. Cases**

*Aenergy, S.A.* v. *Republic of Angola*,
31 F.4th 119 (2d Cir. 2022)......................................................12

*Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018) ...............................................................19, 44

*Bi* v. *Union Carbide Chemicals & Plastics Co.*,
984 F.2d 582 (2d Cir. 1993).....................................................15

*Bigio* v. *Coca-Cola Co.*,
448 F.3d 176 (2d Cir. 2006).....................................................15

*Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*,
665 F.3d 384 (2d Cir. 2011).......................................................7

*Goldberg* v. *Pace University*,
88 F.4th 204 (2d Cir. 2023).....................................................57

*Gonzalez* v. *Naviera Neptuno A.A.*,
832 F.2d 876 (5th Cir. 1987).....................................................14

*Gross* v. *German Foundation Industrial Initiative*,
456 F.3d 363 (3d Cir. 2006).....................................................16

*Iragorri* v. *United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001) (en banc)........................................7

*Law Debenture* v. *Maverick Tube Corp.*
2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008) ...........................51

*Mashantucket Pequot Tribe* v. *Town of Ledyard*,
722 F.3d 457 (2d Cir. 2013).....................................................15

*McCarthy* v. *Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007).....................................................56

*Morrison* v. *National Australia Bank Ltd.*,
561 U.S. 247 (2010) ...............................................................12

*Mujica* v. *AirScan Inc.*,
771 F.3d 580 (9th Cir. 2014).....................................................15

*Nature's Plus Nordic A/S* v. *Natural Organics, Inc.*,
78 F. Supp. 3d 556 (E.D.N.Y. 2015) ........................................48

*Otto Candies, LLC* v. *Citigroup, Inc.*,
 963 F.3d 1331 (11th Cir. 2020)............................................................8

*Petersen Energía Inversora S.A.U.* v. *Argentine Republic*,
 895 F.3d 194 (2d Cir. 2018).........................................29, 37, 41, 45

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
 329 F.3d 64 (2d Cir. 2003)...................................................................9

*Red Tree Invs., LLC* v. *Petróleos de Venezuela, S.A.*,
 82 F.4th 161 (2d Cir. 2023).................................................................14

*Reliable Credit Ass'n* v. *Credithrift of Am., Inc.*,
 570 P.2d 379 (Or. 1977).....................................................................22

*Royal & Sun Alliance Ins. Co.* v. *Century Int'l Arms, Inc.*,
 466 F.3d 88 (2d Cir. 2006).........................................................17, 18

*Smith* v. *Bayer Corp.*,
 564 U.S. 299 (2011)..............................................................................8

*Ungaro-Benages* v. *Dresdner Bank AG*,
 379 F.3d 1227 (11th Cir. 2004)....................................................15, 16

**Argentine Cases and Court Filings**

National Supreme Court of Justice, 2010/05/19, "Consumidores
 Argentinos v. EN – PEN," S.C. Comp. 923. XLIII...........................40

National Supreme Court of Justice, 2014/08/20, "De San Martín, José
 et al. v. EN – PEN," S.C. Comp. 731. L. XLIX ..........................41, 55

National Supreme Court of Justice, 1911/02/16, "Puerto de San
 Nicolás v. Provincia de Buenos Aires," Fallos: 114:124 ...................45

National Court of Appeals in Civil Matters, Chamber E, 2014/05/06,
 "L., G.L. v. D., O.R.," L.L. Online, AR/JUR/19485/2014..........................35, 36

National Court of Appeals in Commercial Matters, Chamber A,
 1999/10/22, "Gatti, Ernesto Ignacio and other v. Bulad, Alfredo
 Ragueb s/ summary," E.D., Vol. 188 .................................................20

National Court of Appeals in Commercial Matters, Chamber A,
 1999/08/31, "Lezcano, Juan C. v. Arismendi S.C.S.," L.L., Vol.
 2000-D .................................................................................................35

iv

National Court of Appeals in Commercial Matters, Chamber A
2010/06/10, "Lipnik, Alberto Teodoro v. Constructora San José
Argentina S.A.," L.L. Online, AR/JUR/32215/2010.........................................35

**U.S. Statutes**

N.Y. Jud. Law § 27 ...................................................................................*passim*

**Argentine Statutes**

Civil Code,
Art. 505 ...............................................................................32, 34, 35
Arts. 652-655 ............................................................................29, 30
Art. 1204 .......................................................................32, 33, 34, 35

Commercial Code, Art. 216 ...............................................32, 33, 34, 35

National Code of Civil and Commercial Procedure,
Art. 1 ..............................................................................................10
Art. 5 ..............................................................................................10

Capital Markets Law (Law No. 26,831) ........................................................25

General Companies Law (Law No. 19,550) ....................................................21

General Expropriation Law (Law No. 21,499)........................................4, 20, 41, 58

YPF Expropriation Law (Law No. 26,741) .......................................................36, 53

YPF Intervention Decree (Decree No. 530/2012) ....................................................40

**Other Authorities**

4 Corpus Juris Secundum Appeal and Error (Mar. 2024 update)...........................34

*Black's Law Dictionary* (11th ed. 2019) .................................................................50

Brief for the United States, *Republic of Hungary* v. *Simon*
(U.S. Sept. 11, 2020), No. 18-1447 ............................................................11, 16

Brief for the United States, *Federal Republic of Germany* v. *Philipp*
(U.S. May 26, 2020), No. 19-351 ........................................................................11

Brief for the United States, *Federal Republic of Germany* v. *Philipp* (U.S. Sept. 11, 2020), No. 19-351 .......................................................16

Andrés Sánchez Herrero, *La Cláusula Penal [The penalty clause]* (1st ed. 2020) ...............................................................................................30

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' opposition confirms everything that is wrong with this litigation. The district court entered a $16.1 billion judgment, the largest in the history of the Southern District of New York, after erroneously deciding multiple issues of Argentine law, including what it belatedly recognized were "issues of first impression." J.A. __ (Dkt. 527 at 6). The Argentine Republic—supported by former Argentine Supreme Court Justices, a former Argentine Treasury Attorney General, and other respected Argentine-law experts—has shown that the district court misunderstood governing public and private Argentine law. In response, plaintiffs brush that law aside, barely citing any Argentine decisions. Instead, they continue to insist that the dispositive Argentine-law issues in these cases are "relatively straightforward" and "not materially different" from U.S. contract law. Opp. 39, 45. They are wrong. This Court—which must review those Argentine-law issues *de novo*—should reverse.

To begin, these cases never should have been heard in the district court. Plaintiffs' claims turn entirely on (i) the bylaws of an Argentine company, (ii) sovereign acts by the Argentine Republic undertaken in Argentina, (iii) rights asserted solely under Argentine law, and (iv) securities that these sophisticated plaintiffs purchased almost entirely from non-U.S. sellers. As a result, this Court now has the unenviable task of serving as an Argentine appellate court.

On *forum non conveniens*, plaintiffs cannot defend the district court's legal errors. Plaintiffs wrongly insist that U.S. courts should decide these disputes to protect U.S. capital markets because, 30 years ago, an IPO for YPF's ADRs took place on the New York Stock Exchange. But plaintiffs did not participate in this 1993 U.S. IPO, and instead purchased all their ADRs starting nearly 15 years later, mostly in private transactions with the Spanish company Repsol. Petersen, which claims nearly 90% of the purported damages, has no connection whatsoever to the United States. And plaintiffs do not bring claims under any provision of U.S. law, including the U.S. securities laws.

Plaintiffs likewise cannot defend the district court's single footnote declining to dismiss on international-comity grounds based on the wrong legal standard. They accuse the Republic of forfeiture, even though the Republic pressed for comity abstention below. They then declare that comity has no application here because no parallel proceeding was pending in a foreign country, even though this Court, other courts of appeals, and the U.S. Government have all rejected that position. This is the paradigmatic case for comity abstention. The Republic has established exclusive frameworks for adjudicating both intra-corporate disputes and expropriation-related claims, and the United States should respect that sovereign's choice.

On the merits, plaintiffs first insist that these two cases present "straightforward" breach-of-contract claims. Yet even plaintiffs admit "there is no

2

precedent" under Argentine law for a breach-of-contract claim between shareholders based on corporate bylaws. Opp. 52. That bears repeating: plaintiffs do not dispute that "*this appears to be the first case* in which one shareholder has sued another under Argentine law for breach of contract based on the breach of a bylaws provision." *Id.* at 51-52 (emphasis added). Unable to cite Argentine law on point, plaintiffs say that "common sense" requires the Court to read "a simple breach-of-contract claim" into YPF's Bylaws. *Id.* at 52. But the relevant provision in YPF's Bylaws bears no indicia of a bilateral contract. Rather, it is a rule governing intra-corporate relations among *all* YPF shareholders. The provision (1) is enforceable by shareholders through specified penalties, (2) obligates and benefits shifting groups of shareholders, (3) is subject to shareholder amendment, and (4) is comparable to a tender-offer obligation since codified in Argentine law for all listed Argentine companies. This provision is not the unicorn that plaintiffs try to make it out to be.

Making matters worse, the district court created a U.S.-style damages remedy that YPF's Bylaws and Argentine law do not allow. In Argentina, a civil-law jurisdiction, courts strictly apply the terms of the governing agreement. By their terms, YPF's Bylaws provide a specific remedy for any violation of the tender-offer provision: the loss of shareholder rights to vote and receive dividends on improperly acquired shares. Argentine law makes that express remedy exclusive. Under

Argentine law, a penalty clause may provide for the loss of rights or benefits, exactly as YPF's Bylaws do here.

Plaintiffs likewise try to brush away the district court's other errors of Argentine law. The district court repeatedly excused fundamental legal deficiencies in plaintiffs' claims: (i) plaintiffs failed to seek specific performance before damages, (ii) they did not hold YPF shares when the alleged "breach" occurred, and (iii) they did not comply with the procedures in Argentina's General Expropriation Law for pursuing expropriation-related claims. On each point, plaintiffs offer only a cursory defense of the district court's departures from settled Argentine law, spending just one page of their 93-page brief trying to distinguish the controlling Argentine Supreme Court decisions.

When it comes to damages—the one aspect of this litigation governed in part by New York law—plaintiffs refuse to accept the consequences of their own choice of forum. Since 1987, New York has required that obligations "denominated in a currency other than currency of the United States" must be converted into U.S. dollars "at the rate of exchange prevailing on the date of entry of the *judgment.*" N.Y. Jud. Law § 27(b) (emphasis added). Here, any damages are necessarily "denominated" in pesos because the YPF Bylaws provide an express pricing formula that can be calculated only in pesos, as plaintiffs' own expert did. J.A. __ § 7(f)(v) (Dkt. 363-1). Yet after creating a contract damages remedy out of whole cloth, the

district court compounded its error by calculating damages using a breach-date currency conversion. Having no way to defend that decision under the plain text of New York law or the formula in YPF's Bylaws, plaintiffs appeal to notions of fairness. But there is nothing unfair about holding plaintiffs to the consequences of their choice of a New York forum, and thus reducing the 37,000% return their litigation financer seeks on claims it purchased for a relative pittance. *See* Republic Br. 3. The district court also committed multi-billion-dollar errors under Argentine law in calculating damages based on the wrong date of alleged breach and wrong prejudgment interest rate.

Finally, in their cross-appeal, plaintiffs say that the district court should not have dismissed Petersen's claim for promissory estoppel. But the court got that issue right. Argentine law does not recognize promissory estoppel as an independent cause of action. In any event, Petersen's promissory-estoppel claim improperly duplicates plaintiffs' breach-of-contract claim and thus fails for many of the same reasons that its primary claim does.

At bottom, this Court should not countenance a $16.1 billion judgment against a foreign sovereign based on an unprecedented and erroneous interpretation of that sovereign's public and private law by a U.S. court that should not have heard these thoroughly Argentine cases. The district court's staggering judgment represents a significant portion of Argentina's fiscal budget, impacting resources that would

5

otherwise be committed to major economic reforms. If a court in another country gave U.S. law similar back-of-the-hand treatment in imposing billions (or, analogously, trillions) of dollars in liability against the U.S. Government, the universal reaction would be disbelief and indignation. This Court should reverse.

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS NEVER BELONGED IN A U.S. COURT.

Under both the doctrine of *forum non conveniens* and principles of international comity, the district court erred in refusing to dismiss plaintiffs' claims. Plaintiffs suggest that a U.S. court was as well suited as an Argentine court to handle what they mischaracterize as a straightforward U.S.-style breach-of-contract case. But plaintiffs offer no good reason why a U.S. court should have decided a dispute—straightforward or otherwise—involving sovereign acts that took place wholly in another country under that country's laws. As all four sovereign amici have underscored, U.S. relations with other nations will be damaged if U.S. courts exercise discretionary jurisdiction over such fundamentally foreign disputes. *See* Brazil & Uruguay Amicus Br. 5-16; Ecuador & Chile Amicus Br. 4-7.

### A.    The District Court Committed Multiple Legal Errors in Not Dismissing These Cases on *Forum Non Conveniens* Grounds.

Plaintiffs emphasize (at 33) that much time has passed since the district court's *forum non conveniens* decision in 2020. But that decision was not appealable as of right until after final judgment. They also try to insulate the court's *forum non*

*conveniens* decision from review by mischaracterizing it as a discretionary decision that "weighs the relevant factors differently" than the Republic does. Opp. 39. But the district court's application of the three-factor test from *Iragorri* v. *United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc)*,* rested on multiple legal errors, which by definition constitute an abuse of discretion requiring reversal here. *See Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*, 665 F.3d 384, 393-394 (2d Cir. 2011).

1.      At step one of the *Iragorri* test, plaintiffs offer no good reason why their decision to litigate the two cases in New York merited any deference. Petersen is the driver of this litigation—it chose the New York forum as the first filer, and it accounts for nearly 90% of the total judgment. And Petersen has absolutely no U.S. ties. Plaintiffs try (at 37) to manufacture connections between Petersen and New York by repeatedly stating that Petersen "purchased NYSE-traded ADRs." But that obscures the key point: Petersen did not purchase *its* ADRs on the NYSE, but rather acquired its securities from the Spanish company Repsol in privately negotiated transactions that took place outside the United States and many years after the 1993 IPO. *See* Republic Br. 13.

Plaintiffs also say (at 37-38) that Petersen deposited certain ADRs in a New York collateral account, and that it lost those ADRs in a New York foreclosure. But Petersen's agreement to keep some of its securities in New York as collateral after

buying them is irrelevant to its claim under Argentine law. Indeed, even the district court recognized that Petersen had no meaningful connection to the New York forum. *See* S.A. 31.

Because *Petersen's* forum choice merits no deference, plaintiffs fall back on *Eton Park's* purported links to New York. But Petersen filed over a year before Eton Park did, and "where a domestic plaintiff is added at the eleventh hour to strengthen the other plaintiffs' connection to the United States[,] . . . reduced deference may be appropriate for all the plaintiffs." *Otto Candies, LLC* v. *Citigroup, Inc.*, 963 F.3d 1331, 1345 (11th Cir. 2020). Plaintiffs insist that Eton Park "was hardly a johnny-come-lately in the district court," noting that it was a "putative class member[]" in Repsol's action in the Southern District of New York in 2012. Opp. 36-37. But an absent class member is not an actual "party" to a case (certainly not before certification) and has no role in selecting the forum. *See Smith* v. *Bayer Corp.*, 564 U.S. 299, 313 (2011) (rejecting argument that "an unnamed member of a proposed but uncertified class" "qualifies as a party to the . . . litigation"). And regardless, Repsol voluntarily dismissed its putative class action before the court decided the Republic's motion to dismiss for *forum non conveniens* in that case. *See Repsol YPF, S.A.* v. *Republic of Argentina*, No. 1:12-cv-3877, ECF No. 12 (S.D.N.Y. May 1, 2013) (Republic's memorandum of law raising *forum non conveniens* arguments); ECF No. 31 (May 9, 2014) (stipulation of voluntary dismissal).

At a minimum, the district court erred in not separately analyzing Petersen's and Eton Park's cases, which were never formally consolidated. *See* Republic Br. 31-32. In response, plaintiffs say that litigating their suits separately would be inefficient and "defeat the purpose of *forum non conveniens*." Opp. 37 (citation omitted). But if the Republic could not defend against both of these cases in its home forum, it would have been far fairer and more convenient to litigate at least Petersen's lawsuit (by far the bigger of the two) in Argentina.

2.     Plaintiffs do not challenge the district court's conclusion at the second step of the *Iragorri* test that Argentine courts provide an adequate forum for these two lawsuits and were entirely capable of fairly adjudicating this Argentine-law dispute. *See* S.A. 69-75.

3.     The third and final step of the *Iragorri* analysis is to "balanc[e] the relative hardships and conveniences" of litigating in a U.S. court versus an Argentine court. *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). The district court did not just get the weighing wrong; it misapplied the law on both sides of the balance. *See* Republic Br. 32-36.

a.     Start with Argentina's side. *First*, plaintiffs try to defend the district court's erroneous prediction in 2020 that no "complicated questions of Argentine law [would] actually arise" in these cases. S.A. 86. Plaintiffs maintain that "the issues of Argentine law in this case are relatively straightforward." Opp. 39. But

9

even the district court no longer believes that to be true.  In a post-judgment ruling, the court correctly recognized that it had, in fact, "decided issues of first impression and questions of Argentine law."  J.A. __ (Dkt. 527 at 6).[1]

Plaintiffs and their amici (none of whom is expert in Argentine law) further try to minimize the district court's predictive error by saying that the Republic "place[s] too much emphasis on the application of foreign law."  Brand & Stewart Amicus Br. 15-17; *see* Opp. 39.  But the Republic's position is not that *every* case presenting any foreign-law issue must be litigated abroad.  Rather, these cases are far different from the many cases involving issues of foreign law, because plaintiffs *exclusively* asserted claims under foreign law—and raise issues of first impression, arising in a civil-law system quite different from our own.  Republic Br. 33.

*Second*, the district court erred in discounting Argentina's substantial interest in hosting intra-corporate disputes involving YPF's Bylaws, as expressed in Article 5, paragraph 11 of Argentina's National Code of Civil and Commercial Procedure and underscored in Article 1.  *See* Republic Br. 34-35.  Plaintiffs claim (at 40) that YPF's expert Professor Cabanellas conceded that Article 5 is not exclusive.  But

---

[1] Plaintiffs half-heartedly contend (at 39 n.2) that the district court could have been talking about novel issues of *U.S.* law.  But the key issues of first impression here were issues of Argentine law, and plaintiffs have not identified any novel issues of U.S. law the court could have been referring to.

Professor Cabanellas clearly said the opposite. J.A. __ (Dkt. 153 ¶ 11) ("Argentine courts have exclusive jurisdiction over Plaintiffs' corporate relationship claims."). In any event, plaintiffs' argument misses the point. Even if an Argentine statute cannot formally foreclose the exercise of jurisdiction by other countries' courts, Article 5 still reflects Argentina's unambiguous interest in hosting these disputes and thus must weigh heavily into the *forum non conveniens* balance.

b.    On the U.S. side, plaintiffs say that the U.S. Government has already taken the position that these cases should be litigated here, but that is not true. The Solicitor General previously addressed only the Foreign Sovereign Immunities Act (FSIA) question, not *forum non conveniens*. In doing so, the Government merely expressed an interest in ensuring that foreign states like the Republic "*do not enjoy immunity* from lawsuits regarding violations of their commercial obligations." U.S. Br. 18, *Argentine Republic* v. *Petersen Energia Inversora, S.A.U.* (U.S. May 21, 2019), No. 18-575 (emphasis added). By expressing its view that Petersen's case *could* be heard here under the FSIA, the Government was not opining that it *should* be. Indeed, the Government has repeatedly distinguished between the jurisdictional FSIA and discretionary doctrines like *forum non conveniens* and comity. *See* U.S. Br. 18, *Republic of Hungary* v. *Simon* (U.S. Sept. 11, 2020), No. 18-1447 (dismissal on *forum non conveniens* and comity grounds may be warranted even if there is jurisdiction); U.S. Br. 17, *Federal Republic of Germany* v. *Philipp* (U.S. May 26,

11

2020), No. 19-351 (same).  As this Court has likewise recognized, "the FSIA does not . . . affect the traditional doctrine of *forum non conveniens*," which in fact may apply "with greater weight . . . to lawsuits against foreign states."  *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 126-127 (2d Cir. 2022).

Plaintiffs next contend that New York and the United States have an interest in hosting these two lawsuits because the Republic and YPF "deliberately induced investors" in New York to invest "in YPF through the NYSE."  Opp. 41.  But Petersen's and Eton Park's cases have nothing to do with protecting U.S. capital markets.  Plaintiffs did not acquire any YPF ADRs on the NYSE in the 1993 U.S. IPO.  Instead, they acquired all their securities more than a decade later, nearly all from Repsol, a Spanish company, in privately negotiated transactions.  *See* Republic Br. 13.  These are thus quintessentially foreign corporate cases involving foreign actors and foreign law.  The United States has no interest in becoming a "Shangri-La" for such entirely foreign disputes.  *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 270 (2010).

Moreover, the framework for protecting U.S. capital markets already exists: U.S. securities laws.  But Plaintiffs have no securities-law claims, unlike the U.S. securities-law cases that the district court erroneously relied on in retaining these cases.  *See* S.A. 84 (quoting *DiRienzo* v. *Philip Servs. Corp.*, 294 F.3d 21, 33 (2d Cir. 2002)).  In their opposition, plaintiffs ignore both those cases and the far more

12

analogous cases that the Republic cited in its opening brief (at 36), in which New York state courts dismissed, on *forum non conveniens* grounds, shareholder claims against European companies over alleged breaches of corporate duties governed by foreign law.

4. Finally, plaintiffs say that the Republic has not shown that litigating these cases in the United States caused it "substantial prejudice," and suggest that in fact plaintiffs would be prejudiced by dismissal. Opp. 33-35. Both contentions are wrong.

Plaintiffs assert (at 34-35) that given the post-judgment posture of the case, the Republic must demonstrate "substantial prejudice" by showing that "key evidence or witnesses were unavailable during trial" in the U.S. forum, or that it "did not receive a fair trial because of the forum's animosity or prejudice, or any other serious prejudice." *Id.* at 34 (internal quotation marks omitted). They assert that the Republic "does not and cannot claim" to make this showing. But the Republic *does* maintain and has demonstrated that it "did not receive a fair trial," because it was forced to litigate complex Argentine-law issues, including issues of first impression, before a U.S. court unfamiliar with the Argentine civil-law system. *See* Republic Br. 36-37.

Plaintiffs also wrongly suggest (at 33) that *they* will suffer prejudice from dismissal in a post-judgment posture, because they have already spent "untold

amounts of time and money" litigating the cases. There is nothing improper about dismissing a case on *forum non conveniens* grounds after judgment. *See Gonzalez* v. *Naviera Neptuno A.A.*, 832 F.2d 876, 881 (5th Cir. 1987). If there were ever an occasion for doing so, it is here. Moreover, plaintiffs elected to bring claims governed solely by Argentine law and involving foreign witnesses and translated evidence in a U.S. court—it should not come as a surprise that the ensuing litigation became protracted and expensive.

### B.     The District Court Committed Legal Error in Not Dismissing Under the International-Comity Doctrine.

Settled principles of international comity also require reversal. Argentina has a strong, statutorily expressed interest in litigating these thoroughly Argentine disputes in its own courts, whereas the United States has a minimal or nonexistent interest in hosting Argentine intra-corporate cases. *See* Republic Br. 37-42.

As a threshold matter, plaintiffs say that the Republic forfeited its international-comity argument—not because the Republic did not raise the argument in its district court briefing, but because it made the argument under a heading that focused on *forum non conveniens*. That is not how forfeiture works. "[A]rguments made on appeal need not be identical to those made below," so long as "the elements of the claim were set forth and additional findings of fact are not required." *Red Tree Invs., LLC* v. *Petróleos de Venezuela, S.A.*, 82 F.4th 161, 174 (2d Cir. 2023) (citation omitted).

The Republic included a fully developed comity argument in its motion to dismiss, and cited cases (including many of the same ones it cites on appeal) that treat comity as an independent basis for dismissal. *See* J.A. \_\_ (Dkt. 111 at 30-32) (citing *Bigio* v. *Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000); *Mujica* v. *AirScan Inc.*, 771 F.3d 580, 615 (9th Cir. 2014); *Ungaro-Benages* v. *Dresdner Bank AG*, 379 F.3d 1227, 1240 (11th Cir. 2004)). The Republic did not forfeit this purely legal argument—which the district court squarely, albeit only briefly, addressed, *see* S.A. 87 n.15—based on how it organized the headings in its brief. And this Court has cautioned against an "overly formalistic application" of forfeiture in the comity context. *See Mashantucket Pequot Tribe* v. *Town of Ledyard*, 722 F.3d 457, 465 (2d Cir. 2013) (citation omitted).

On the merits, plaintiffs' only real response is to claim that abstention in favor of a parallel foreign proceeding is the only valid form of adjudicative comity. Opp. 43; *see* Professors Dodge and Gardner Amicus Br. 15-17. But this Court, other courts of appeals, and the U.S. Government have rejected that narrow view of comity. This Court has previously recognized that adjudicative comity applies even when no related proceeding is pending in a foreign court. *See Jota* v. *Texaco, Inc.*, 157 F.3d 153, 159-161 (2d Cir. 1998); *see also Bigio*, 448 F.3d 176; *Bi* v. *Union Carbide Chems. & Plastics Co.*, 984 F.2d 582, 586 (2d Cir. 1993). Other courts of appeals have also recognized this form of adjudicative comity. *See, e.g.*, *Mujica*,

771 F.3d at 598-599; *Ungaro-Benages*, 379 F.3d at 1238.[2] So too has the U.S. Government. *See* U.S. Br. 11-17, *Republic of Hungary* v. *Simon* (U.S. Sept. 11, 2020), No. 18-1447; U.S. Br. 32-33, *Federal Republic of Germany* v. *Philipp* (U.S. Sept. 11, 2020), No. 19-351. The U.S. Government has also rejected plaintiffs' claim that applying adjudicative comity would "contravene[] Congress' judgment in enacting the FSIA." Opp. 44. As the U.S. Government has explained, the FSIA does not prevent courts from abstaining from exercising jurisdiction as a matter of international comity (or *forum non conveniens*). *See supra*, p. 11.

The district court erroneously applied the inapposite "exceptional circumstances" test in deciding whether to abstain. *See* S.A. 87 n.15. But that test applies only in cases involving parallel proceedings. Because there were no parallel proceedings here, the district court erred in not applying the more general test examining (1) the foreign sovereign's interest, (2) the United States' interest, and (3) the adequacy of the foreign forum. *See* Republic Br. 39. Plaintiffs respond (at 44) that it would be odd to require a stricter test in cases with pending foreign

---

[2] Plaintiffs wrongly claim that the Third Circuit "rejected" adjudicative comity in the absence of parallel foreign proceedings in *Gross* v. *German Foundation Industrial Initiative*, 456 F.3d 363, 393-394 (3d Cir. 2006). *See* Opp. 44. Although the Third Circuit expressed some "skepticism" of the doctrine as articulated by the Eleventh Circuit in *Ungaro-Benages*, 379 F.3d at 1237-1239, it ultimately sidestepped the question. *Gross*, 456 F.3d at 394.

proceedings than cases without them. But the exceptional-circumstances test is simply a *different* test applying factors tailored to the existence of the foreign proceeding—not a more stringent one. The exceptional-circumstances test includes factors like "the similarity of the parties" and "the order in which the actions were filed," which make little sense outside the context of a parallel foreign proceeding. *See Royal & Sun All. Ins. Co.* v. *Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).

Here, the three operative factors strongly favor dismissal. As the district court expressly found, Argentina's courts supply an adequate forum. And Argentina clearly has a substantial interest in these cases, which are governed solely by Argentine law and based on conduct exclusively in Argentina involving the Argentine sovereign and an Argentine company's bylaws. *See* Opp. 45. In claiming that the United States *also* has a strong interest in the litigation, plaintiffs again rely on a single out-of-context line from the Solicitor General's brief about the distinct FSIA question. *See id.* With that line put in its proper context, there is no doubt that Argentina's interest in these foreign-cubed disputes far outweighs that of the United States.

In any event, the district court overlooked obvious exceptional circumstances present here. Argentina has two exclusive dispute-resolution frameworks applicable to these disputes—one for intra-corporate disputes and one for expropriation-related

claims. *See* Republic Br. 40-41. Those are exactly the type of statutory provisions expressing a foreign sovereign's strong interest in adjudicating particular disputes in its home courts, to which U.S. courts defer on comity grounds. *See Royal & Sun All.*, 466 F.3d at 95 (treating "a foreign nation's interest in uniform bankruptcy proceedings" as an exceptional circumstance).

## II.    PLAINTIFFS' CLAIMS FAIL UNDER GOVERNING ARGENTINE LAW.

After wrongly exercising jurisdiction over these thoroughly Argentine cases, the district court misapplied Argentine law at every turn. Even plaintiffs acknowledge that the court did something striking: without citing any Argentine case law, it recognized an unprecedented cause of action for money damages by one set of shareholders against another for breach of a corporate bylaw. Opp. 52.

Plaintiffs cannot explain away the district court's other significant Argentine-law errors. The court refused to give effect to the express penalties specified in YPF's Bylaws for breach of the tender-offer provision, even though those penalties are exclusive under Argentine law. The court misapplied Argentine code provisions requiring a party seeking contract damages to first seek specific performance. The court permitted plaintiffs to prosecute their "breach" claim, even though they sold their YPF shares before the Republic supposedly breached its tender-offer obligation by acquiring Repsol's YPF shares. And the court ignored Argentine Supreme Court case law holding that the Argentine General Expropriation Law requires any claims

18

relating to an expropriation to be adjudicated within the country's exclusive expropriation framework. Each error independently requires reversal. And taken together, those compounding errors confirm that these Argentine claims never should have been litigated in a U.S. court in the first place.

### A. Argentine Law Has Never Recognized Plaintiffs' Unprecedented "Breach of Contract" Claims.

Plaintiffs admit that "there is *no precedent*" in Argentine law for a shareholder-versus-shareholder claim for damages based on the breach of corporate bylaws. Opp. 52 (emphasis added). Yet, other than their misleading mantra about the 1993 YPF IPO, plaintiffs offer no reason why a U.S. court applying Argentine law should be the first to break this new ground—least of all in entering a $16.1 billion judgment against a foreign sovereign in contravention of its reasoned and supported view of its own laws. *See Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 585 U.S. 33, 35 (2018). Plaintiffs misleadingly suggest that this Court has already decided that YPF's Bylaws were a bilateral agreement because it described them as a "contract" in its 2018 FSIA opinion. Opp. 47. But this question of Argentine law was not before this Court and has never been decided by it. Plaintiffs also try to make hay out of one expert's comment that Argentine corporate bylaws could *in theory* incorporate a bilateral agreement giving rise to breach-of-contract liability, but neither the expert nor plaintiffs have identified any real-world

example.  And YPF's Bylaws have all the markers of traditional rules of corporate governance, not a never-before-seen bilateral agreement masquerading as bylaws.

1.      Plaintiffs first try to brush aside the unprecedented nature of their U.S.-style contract claims by mischaracterizing these cases as ordinary contract disputes governed by Argentina's Civil Code.  Opp. 47-48.[3]  Under Argentine law, corporate bylaws are not bilateral contracts between shareholders, but rather organizational documents that "govern how a company functions."  J.A. __ (Dkt. 368-1 ¶¶ 73, 77). In particular, plaintiffs ignore the *Gatti* case, in which Argentina's National Court of Appeals in Commercial Matters explained that the "rights and the obligations" of the shareholders "revolve around their relations with the legal subject called the company, and not in relation to each one of the other [shareholders] individually considered."   National Court of Appeals in Commercial Matters, Chamber A, 1999/10/22, "Gatti, Ernesto Ignacio and other v. Bulad, Alfredo Ragueb s/ summary" E.D., Vol. 188, at 698 (S.A. 335).

---

[3] Plaintiffs contend that the Republic does not "meaningfully contest" that "the substantive elements" of their claims are satisfied here.  Opp. 46.  Not true.  The Republic has always maintained that plaintiffs' claims lack multiple elements, including the critical requirement of a bilateral agreement.  *See* J.A. __ (Dkt. 373 at 19-28); J.A. __ (Dkt. 402 at 25-35); J.A. __ (Dkt. 410 at 8-12, 15-18).  The Republic has also contested breach:  the Republic was not obligated to make a tender offer because the General Expropriation Law would preempt any such obligation as an impermissible encumbrance on an expropriation.  *See infra*, pp. 40-45; Republic Br. 61-71.

Because bylaws create internal corporate rules, the exclusive mechanism for enforcing a violation of an Argentine company's bylaws is to seek relief through Argentina's corporate-law system, as specified in its General Companies Law (GCL). *See* Republic Br. 44-45. As leading Argentine private-law experts have explained: "Under Argentine law, in the event of a violation of corporate bylaws, a shareholder *must*—regardless of the remedy that they would otherwise *prefer*—resort to the mechanisms that the bylaws themselves or the [G]CL provide." Argentine Private-Law Scholars Amicus Br. 14; *see* Republic Br. 43-53.

Plaintiffs acknowledge that in the context of the Republic's expropriation of Repsol's YPF shares, many YPF shareholders pursued remedies under the GCL, but they nevertheless insist that the GCL procedures are not "exclusive" and somehow coexist with a generic breach-of-contract cause of action under the Argentine Civil Code. Opp. 51. Again, though, the Argentine Civil Code has never treated bylaws provisions as bilateral contracts giving rise to breach-of-contract liability. And even if bylaws were bilateral contracts, the specific remedies for violations of corporate bylaws in Articles 251 and 254 of the GCL would bar the more general breach-of-contract remedy under the Civil Code. *See* J.A. __ (Dkt. 398-19 at 182:7-8) (plaintiffs' expert acknowledging the Argentine-law rule that "definitely the lex specialis prevails over the lex generalis").

21

Indeed, even under U.S. law, plaintiffs' claims are unprecedented. Plaintiffs and their amici purport to identify U.S. examples, but none works. *See* Opp. 51 n.6; American Association of Justice Amicus Br. 19. The best they have is one Oregon case from 47 years ago, in which one member of a lending exchange "conceded that" the plaintiff had pleaded the existence of a contract in the exchange's bylaws. *Reliable Credit Ass'n* v. *Credithrift of Am., Inc.*, 570 P.2d 379, 381 (Or. 1977). The other cases they cite do not involve shareholder-versus-shareholder suits for damages, and are quoted only for the generic proposition that bylaws are "a contract among shareholders"—a common shorthand that elides the question here. *See* U.S. Corporate Law Scholars Amicus Br. 4-12.

2. Without any on-point Argentine (or even U.S.) cases or other authorities, plaintiffs—like the district court—latch onto a hypothetical addressed by the Republic's expert, Dr. Manóvil, in his reply report. *See* Opp. 48. Dr. Manóvil speculated that, as a theoretical matter, a bilateral agreement *could* appear in corporate bylaws if the bylaws (for some reason) included within them obligations between named shareholders. *See* J.A. __ (Dkt. 368-3 ¶ 90 & n.173). But he unambiguously testified that the Bylaws here contained no such bilateral agreement, and plaintiffs fail to point to any example of bylaws that do. *See* J.A. __ (Dkt. 368-3 ¶ 95).

Even if corporate bylaws theoretically *could* contain bilateral agreements under Argentine law, YPF's Bylaws do not. *See* Republic Br. 48-49. Again, the very strong default—indeed, the uniform practice—under Argentine (and U.S.) law is that bylaws are rules of internal corporate governance among shareholders that are enforceable by intra-corporate remedies, not breach-of-contract actions for damages. Thus, any bilateral agreement in a corporate bylaw would need to be very explicit and look quite distinct from a rule of shareholder behavior, to give rise to the first-ever bylaws provision enforceable by a breach-of-contract claim for damages. But there is nothing so explicit or unusual about the provisions here.

On the contrary, several features of YPF's Bylaws make clear that the tender-offer obligations are ordinary corporate bylaws provisions, and do not contain extraordinary bilateral agreements. *First*, YPF's Bylaws—including the tender-offer provisions—apply to *all* shareholders, which suggests that they constitute ordinary rules of shareholder behavior. Although the Republic is named in Section 28 of YPF's Bylaws because it has a different triggering percentage, *every* acquiring YPF shareholder has a tender-offer obligation under Section 7 at some triggering percentage. *See* J.A. __ §§7(d)-(f), 28 (Dkt. 363-1).

*Second*, the shareholders on both sides of the tender-offer obligations—that is, those who would both be obligated to make a tender offer and who would benefit from such a tender offer—are an ever-shifting group that changes from one day to

23

the next.  No bilateral agreement allows that without novation.  *See* Republic Br. 48-49.[4]

*Third*, because the tender-offer provisions in YPF's Bylaws are just shareholder rules, a controlling shareholder could vote to change them without approval from the Republic (or other affected shareholders).  Repsol, for example, at one point held over 99% of YPF's capital stock.  J.A. __ (Dkt. 393 ¶ 21).  During that period, Repsol could have voted to alter or eliminate the tender-offer requirements without the Republic's consent.  Bilateral contracts enforceable by claims for damages do not permit an entity that was not even originally a party to the contract to unilaterally amend its terms.

*Fourth*, the penalty provisions in YPF's Bylaws provide for remedies that run to all shareholders—namely, denial of the right to vote and receive dividends.  *See*

---

[4] Plaintiffs claim that the Republic's argument implies that "a breach-of-contract claim is categorically unavailable under Argentine law for any contract that allows the parties to assign their rights to others."  Opp. 50.  But plaintiffs misunderstand the difference between assignment and novation.  The Bylaws here gave YPF shareholders rights, but they also imposed obligations—for example, the obligation to conduct a tender offer if a shareholder were to acquire a certain percentage of shares.  Although *rights* under a contract may be freely assignable to entities whose identities are not yet known, novation is required when both rights *and* obligations are transferred to a new party.  And novation is not possible unless the identity of all parties is known, because novation requires the debtor to identify "another person" specifically to take over the obligation, and the creditor has to accept that other person as a replacement and "expressly declare[] their intent to release the original debtor."  Civil Code, Art. 814 (Add. 2a).

J.A. __ (Dkt. 368-1 ¶¶ 79-82, 115-119). These are standard corporate remedies that make sense as applied to a shareholder qua shareholder, and that are in no way suggestive of a side contractual agreement enforceable by claims for damages.

*Fifth*, the YPF tender-offer provisions are standard corporate fare in Argentina. In 2012, Argentina codified in its Capital Markets Law a mandatory tender-offer requirement that applies to all listed companies. *See* Republic Br. 46. Under that law, the failure to make a tender offer carries similar sanctions to those in the YPF Bylaws (including loss of voting rights), but does *not* authorize a damages remedy. *See* S.A. 221-222. Plaintiffs' response (at 51 n.5) that the 2012 Capital Markets Law does not apply to this dispute misses the point. That law reflects that tender-offer requirements are a familiar rule of shareholder behavior in Argentina and are remediable through internal corporate mechanisms.

3. In response to all that, plaintiffs say that the Republic has "forfeited" its argument that YPF's Bylaws do not contain a bilateral agreement. Opp. 49. They contend that the Republic below made only the "categorical" argument that bylaws provisions are not bilateral contracts, not a "noncategorical" argument that YPF's Bylaws are not bilateral contracts. *Id.* at 48-50. Wrong again. The Republic has consistently maintained that YPF's Bylaws do not include bilateral agreements. *See supra*, pp. 14-15 (discussing forfeiture). As the district court recognized, the

Republic and its experts made the point in both ways below.[5]  Plaintiffs try to fault the Republic for citing additional authorities on appeal, but parties are not limited on appeal to their district-court citations.

Plaintiffs' substantive responses to the Republic's arguments fare no better. They contend that YPF's Bylaws are bilateral because they represent an agreement between the Republic and a defined set of persons on the other side—"all shareholders"—in perpetuity.  Opp. 50.  But again, "all shareholders" is not a defined group of contracting parties, but rather could shift from one day to the next. *See* Republic Br. 48-49.  And the argument proves too much.  Every rule of shareholder behavior could be defined that way—a "promise" by one shareholder to give notice to all other shareholders before introducing a resolution, a "promise" to transfer shares only subject to certain conditions, a "promise" to maintain certain ownership percentages, and so on.  If every promise from one shareholder to another amounted to a bilateral contract enforceable by claims for damages under Argentine

---

[5] *See, e.g.*, S.A. 124 ("The Republic first argues that . . . corporate bylaws do not create bilateral contracts or obligations."); S.A. 125 ("The Court rejects the argument that the Republic's obligations under Sections 7 and 28 were not bilateral."); J.A. __ (Dkt. 368-1 ¶ 66) ("[B]ylaws . . . are not bilateral contracts.  Rather, corporate bylaws are 'plurilateral organizational' contracts."); J.A. __ (Dkt. 368-3 ¶ 95) ("It should be noted, in any event, that the tender offer obligation in the Bylaws here is clearly of a plurilateral nature and cannot be deemed bilateral.").

law, plaintiffs should be able to cite many examples of breach-of-contract suits over shareholder rules. Instead, they cite none.

In the end, plaintiffs are left to argue that it would defy "common sense" for there to be no breach-of-contract suit for damages available here, and that the YPF IPO would have failed without such a remedy. Opp. 52. To the contrary, it makes perfect sense that shareholders who were on notice when they acquired YPF securities that any Bylaws disputes would be "governed by Argentine law" and adjudicated "in an Argentine court" cannot bring a cause of action that does not exist under Argentine law. J.A. __ (Dkt. 112-2 at 88). In fact, other YPF shareholders brought corporate claims in Argentina. *See* Republic Br. 15-17, 44-45. What defies common sense is the notion that plaintiffs or other purchasers of YPF ADRs were banking on a never-before-applied theory of Argentine law, as opposed to the express (and onerous) penalties for a breach of the tender-offer requirement specified in YPF's Bylaws—*i.e.*, loss of voting and dividend rights.

Plaintiffs also offer only their say-so that the YPF tender-offer provisions, much less an unprecedented "breach of contract" enforcement mechanism, were of critical importance to purchasers of YPF ADRs in the 1993 IPO, let alone many years after. They insist (at 13) that the IPO Prospectus "repeatedly referred to . . . the tender-offer requirement," but of course the same Prospectus clearly informed investors that any claims would be "governed by Argentine law" and were "required

to be brought in an Argentine court." J.A.__ (Dkt. 112-2 at 88). In addition, none of the analysts following YPF at the time of the 1993 IPO (or thereafter) thought that the tender-offer provisions would provide significant protection for minority investors. *See* J.A. __ (Dkt. 398-7 ¶¶ 52, 56). In fact, only seven of the 2,069 analyst reports covering YPF or Repsol between 1993 and 2012 even *mentioned* the tender-offer provisions. *See* J.A. __ (Dkt. 398-7 ¶ 62). There is no evidence supporting plaintiffs' speculation that the "IPO would have failed dramatically" had investors known they could not rely on an unprecedented theory of Argentine law to enforce the tender-offer provisions. Opp. 52.

### B. Damages Are Otherwise Unavailable Under Governing Argentine Law.

Even if plaintiffs could bring breach-of-contract actions against the Republic, they would not be entitled to damages. Throughout their brief, plaintiffs suggest that this Court already determined that damages were available, by describing the tender-offer requirement as guaranteeing shareholders a "compensated exit." *See, e.g.*, Opp. 3, 13. This Court, of course, was merely describing the way a tender offer would work as pleaded, not opining on whether damages are available under Argentine law—a question that was never before it.

On the merits, plaintiffs concede that "Sections 7 and 28 of the Bylaws spell out specific enforcement obligations in connection with acquisitions of control." Opp. 85. Those specified "enforcement obligations," which YPF's Bylaws label

"penalties" and Argentine law makes exclusive, do not include damages—only the loss of voting rights and dividends. J.A. __ § 28(C) (Dkt. 363-1). In addition, Argentine law separately required plaintiffs to seek specific performance before damages. In claiming that specific performance is optional rather than mandatory, plaintiffs misconstrue a provision of the Argentine Civil Code and ignore others.

### 1. The YPF Bylaws' penalties are an exclusive remedy.

Section 7(h) of YPF's Bylaws specifies the consequences of a failure to comply with tender-offer provisions: an acquirer is stripped of the right to vote its shares, count them toward a quorum, and collect dividends. J.A. __ § 7(h) (Dkt. 363-1). Those "penalties for breaching . . . are drastic." *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 200 (2d Cir. 2018). And Argentine Civil Code Article 655 (S.A. 204) makes them exclusive. Plaintiffs claim that the district court could create a damages remedy out of whole cloth because Section 7(h) is not a penalty clause under Argentine law. They assert that this clause (1) is "not directed to Argentina," and (2) does not "have as its object" "any other performance." Opp. 54-55 (quoting S.A. 130). Plaintiffs are wrong on both counts.

*First*, Section 7(h) is directed to *all* acquiring shareholders, including the Republic (via Section 28(C)). It provides that an acquirer who does not make a tender offer cannot vote its shares, count those shares toward a quorum, or receive dividends. It does not refer to damages. Plaintiffs say (at 54) that Section 7(h)

cannot be directed to the Republic because "it imposes an obligation on YPF" to enforce the enumerated penalties. Section 7(h) does not obligate YPF to do anything, *see* S.A. 114, but even if it did, the target of the penalties is still the shareholder who allegedly breaches YPF's Bylaws.

*Second*, plaintiffs insist (at 55) that the statutory language describing a penalty clause as forcing "any other performance that may be the object of the obligations" cannot encompass a penalty that involves a loss of rights.[6]  As the Argentine private-law amici explain, however, "a valid penalty clause does not necessitate 'specific performance' or even the 'substitute performance'" that plaintiffs insist is a requirement.  Br. 20.  Rather, the authoritative treatise on Argentine penalty clauses explains that the "loss of . . . rights . . . or benefits"—including, in the corporate context, the "suspension in the exercise of [a shareholder's] rights"—is a qualifying sanction under Argentine Civil Code Article 653.  Andrés Sánchez Herrero, *La cláusula penal [The penalty clause]* 83 (2020) (S.A. 385); *see* J.A. __ (Dkt. 368-1 ¶ 112 & n.139); *see* Argentine Private-Law Scholars Amicus Br. 20-21.

---

[6] Plaintiffs quibble over whether the proper translation of Article 653 of the Civil Code is "any other *performance* that may be the object of the obligations" or "any other *benefit* that may be the object of obligations."  *See* Opp. 54 n.7.  Neither term fully captures the original Spanish ("*prestación*"), but both are acceptable translations.  The difference is immaterial because neither justifies plaintiffs' narrower reading, which is refuted by experts in Argentine penalty-clause law.

Plaintiffs seek support for their theory that YPF's Bylaws do not contain a penalty clause in a graduate thesis written 40 years ago by YPF's expert, Aída Kemelmajer. To be clear, Dr. Kemelmajer's report in this litigation "ha[d] nothing to do with . . . penalty clauses." J.A. __ (Dkt. 409-5 at 125:18-23). But even Dr. Kemelmajer's early work reflected that the sanctions imposed by a penalty clause "may include . . . obligations to refrain from doing something." Argentine Private-Law Scholars Amicus Br. 20 n.33 (quoting Aída Kemelmajer de Carlucci, *La Cláusula Penal: Su Régimen Jurídico en el Derecho Civil, Comercial, Laboral, Administrativo, Tributario, Internacional y Procesal* 38 (1981)). Section 7(h) of YPF's Bylaws bars a party who fails to make a tender offer from voting its shares and collecting dividends, so it qualifies as a penalty clause even under Dr. Kemelmajer's somewhat dated definition.

Plaintiffs fall back (at 56) on the claim that Section 7(h) of YPF's Bylaws would not limit liability even if it were a penalty clause because the Republic willfully breached its obligations. But that exception applies only in cases of *malicious* breach, which requires a specific intent to cause harm. *See* J.A. __ (Dkt. 368-2 ¶ 111). Plaintiffs have not shown that here. At the time of the expropriation of Repsol's majority stake in YPF, the Republic's view was—and continues to be—that an expropriation pursuant to a duly enacted public law would preempt the private tender-offer obligation. *See* J.A. __ (Dkt. 398-13 at

31

AR00069040-AR00069042). Plaintiffs' expert conceded that such a "good faith belief" that the tender-offer obligation was not binding because it was preempted by the expropriation laws "definitely cannot qualify as willful," much less malicious, "intent." *See* J.A. __ (Dkt. 398-19 at 201:10-202:4). Plaintiffs' claim that the Republic acted maliciously thus rests on a misrepresentation of a few lines from a single political speech by one member of the Argentine government. *See* Republic Br. 66 n.8.

## 2. Argentine law required plaintiffs to seek specific performance before damages.

Even if plaintiffs could bring bilateral breach-of-contract claims, they would be independently barred from seeking damages because they failed to show that (i) they previously sought specific performance, or (ii) performance was impossible, and the impossibility was the Republic's fault. Plaintiffs do not dispute that they failed to seek specific performance. Rather, they claim that Article 505 of the Argentine Civil Code lists remedies from which plaintiffs can pick and choose in any sequence. Opp. 57.

Like the district court, plaintiffs misread the relevant Argentine statutes. Article 505 specifies the menu of remedies that Argentine law makes potentially available in both tort and contract cases. Meanwhile, *other* more specific statutory provisions—as relevant here, Article 1204 of the Civil Code and Article 216 of the Commercial Code—specify when and under what circumstances each of those

remedies is available in a particular contract case. *See* Republic Br. 54-58. Those provisions require that the non-breaching party first demand that "the non-performing party fulfill their obligation." Civil Code, Art. 1204 (S.A. 205); Commercial Code, Art. 216 (S.A. 210). If performance is refused, the claim for specific performance automatically converts to a termination claim, *id.*, which is not applicable here, *see* Republic Br. 58. Only if performance "becomes impossible due to the [breaching party]'s fault" does the claim for specific performance "convert[] into an obligation to pay damages," Civil Code, Art. 889 (S.A. 205). That mandatory ordering reflects Argentine civil law's preference for "in-kind" remedies over damages, which even plaintiffs' expert conceded is a cornerstone of civil-law systems: "[W]hen you say if there is a preference in the civil law for a specific performance, nobody will doubt that. Of course, that has always been the case." J.A. __ (Dkt. 398-19 at 226:1-12).

Plaintiffs thus cry forfeiture for the third time: they claim the Republic is raising new arguments based on new provisions of the Argentine Civil and Commercial Codes. They are wrong twice over. *First*, the Republic's expert specifically raised Article 1204 of the Civil Code and Article 216 of the Commercial Code in his report, *see* J.A. __ (Dkt. 368-1 ¶ 96 & n.122), and the Republic cited the relevant portion of his report in its briefing, *see* J.A. __ (Dkt. 373 at 29). *Second*, the Republic's argument is and always has been that plaintiffs were required (and

failed) to show that the Republic made performance impossible before seeking damages. *See, e.g.*, J.A. __ (Dkt. 373 at 29-30). A party can cite new authorities in support of an argument raised below. *See* 4 Corpus Juris Secundum Appeal and Error § 297 (Mar. 2024 update) ("[A]lthough courts generally do not consider new issues raised for the first time on appeal, they may consider new authorities."). All of the statutory provisions cited by the Republic are interrelated and merely reinforce the conclusion that first seeking specific performance is mandatory.

On the merits, plaintiffs do not refute the Republic's explanation of how the various provisions of the Argentine statutory scheme interact. They first suggest that the Republic conceded below that Civil Code Article 505 "lists the available remedies for breach." Opp. 57 (quoting J.A. __ (Dkt. 410 at 20)). But in the second half of the quoted sentence, the Republic explained that Article 505, as applied to a breach-of-contract case, "lists the available remedies for breach *in the order in which those remedies may be pursued*"—*i.e.*, specific performance before damages. J.A. __ (Dkt. 410 at 20) (emphasis added). In other words, far from conceding plaintiffs' point below, the Republic directly opposed it.

Plaintiffs then contend that Articles 1204 and 216 (of the Civil and Commercial Codes, respectively) are permissive, rather than mandatory, so plaintiffs *may* elect specific performance over damages, but are not required to do so. Opp. 58. On-point Argentine case law says otherwise. In *Lipnik*, the National Court of

Appeals for Commercial Matters held that "the plaintiff had no right in claiming damages" without having "served conclusive notice on [the defendant] demanding that it comply with its obligations," or "terminated the contract." National Court of Appeals in Commercial Matters, Chamber A, 2010/06/10, "Lipnik, Alberto Teodoro v. Constructora San José Argentina S.A.," L.L. Online, AR/JUR/32215/2010 at 24 (S.A. 369-370); *see* National Court of Appeals in Commercial Matters, Chamber A, 1999/08/31, "Lezcano, Juan C. v. Arismendi S.C.S.," L.L., Vol. 2000-D at 12 (S.A. 344-345) (same); National Court of Appeals in Civil Matters, Chamber E, 2014/05/06, "L., G.L. v. D., O.R.," L.L. Online, AR/JUR/19485/2014 at 4 (S.A. 325) (same).

Plaintiffs dismiss *Lipnik* and *Lezcano* on the ground that they "are governed by Article 216 of the Commercial Code, rather than Article 505 of the Civil Code (which controls here)." Opp. 58. But there is no such dichotomy in Argentine law; *both* Article 505 of the Civil Code *and* Article 216 of the Commercial Code (as well as Article 1204 of the Civil Code) apply here. The former lays out the potentially available remedies, and the latter clarifies when they are actually available in cases involving reciprocal obligations. That is exactly what *L., G.L.* makes clear. Plaintiffs quote the National Court of Appeals' statement in that case that Article 505 does not "prescribe a mandatory order of priority." Opp. 59 n.9 (quoting S.A. 326). But provisions *other than Article 505* prescribe a mandatory order of

priority. Thus, the National Court of Appeals further held in *L., G.L.* that "a claim for damages in lieu for actual performance of a contractual obligation[] is only in the alternative," and damages "should only be resorted to where actual performance of the obligation is absolutely impossible." National Court of Appeals in Civil Matters, Chamber E, 2014/05/06, "L., G.L. v. D., O.R.," L.L. Online, AR/JUR/19485/2014 at 4 (S.A. 325).

Finally, plaintiffs claim (at 60) that, even if there were a specific-performance requirement, they were excused because the Republic's breach caused Petersen's creditors to foreclose on its ADRs, making it impossible for Petersen to tender its ADRs. To start, that argument does not help Eton Park: Eton Park voluntarily sold its securities *after* the passage of the YPF Expropriation Law. *See* Republic Br. 18. It also does not excuse Petersen. Petersen clearly cannot meet the high bar for impossibility because it had time to seek specific performance between when the YPF Expropriation Law was announced and when Petersen's lenders foreclosed; it elected not to, on the advice of counsel. *See id.* at 17; J.A. __ (Dkt. 393 ¶¶ 66, 80-81, 85-88). In addition, under Argentine causation principles, the "adequate cause of Petersen's loss of its YPF shares" was not anything the Republic did. J.A. __ (Dkt. 368-2 ¶ 103). Rather, it was Petersen's "fail[ure] to make payment on its debts," "having knowingly assumed the risk of a highly leveraged debt which it did not have

sufficient means to pay" without extraordinary dividend payments. *Id.*; *see id.* ¶¶ 69, 92, 98-102.

## C. Plaintiffs Were No Longer Shareholders When the Supposed Breach Occurred.

Even assuming that *some* minority YPF shareholder could have brought a breach-of-contract action for damages against the Republic, plaintiffs could not have because they were no longer YPF shareholders in 2014 when the Republic acquired YPF shares from Repsol. *See* Republic Br. 16-18. Plaintiffs claim that the district court was correct in reading the tender-offer obligation in YPF's Bylaws to be triggered by managerial control alone, without actual acquisition of title to Repsol's shares. Opp. 61-63. That is wrong. Under the terms of YPF's Bylaws, the tender-offer requirements apply to "all *acquisitions*," direct or indirect, of a triggering quantity of shares. Under settled Argentine law, "acquisition" means obtaining title. *See* Republic Br. 59-61.

Plaintiffs first urge this Court not to decide whether the YPF Bylaws provision required title to shares or merely control. They claim (at 61) that a panel of this Court already decided the question in its 2018 FSIA decision. But this Argentine-law question was neither presented to nor decided by this Court. Plaintiffs latch onto the Court's use of the phrase "acquisition of a control position" in describing YPF's Bylaws in its pleading-stage decision. *Petersen*, 895 F.3d at 207. But that shorthand

did not amount to a decision of this Court on an important question of Argentine law that was not even before it.

Now that the question is presented here, plaintiffs agree that the timing of any breach turns on the meaning of YPF's Bylaws' term "acquisition." *See* Republic Br. 59; Opp. 61-63. But they are mistaken as to what "acquisition" entails. Again, under Argentine law, "acquisition" *simpliciter* means "obtaining *title* to something, owning it." J.A. __ (Dkt. 368-2 ¶ 49). Plaintiffs say that the Republic's expert Dr. Manóvil "conceded" that "when 'acquisition' has as its object 'control,' it means acquisition of control, not acquisition of formal title." Opp. 62-63 (quoting Dr. Manóvil). But in Section 28 of YPF's Bylaws, "control" is *not* the object of "acquisition." Section 28 states that the tender-offer obligation applies to "all *acquisitions* made by the National Government . . . *of shares or securities* of the Corporation . . . if, as a consequence of such *acquisition*, the National Government becomes the owner, or exercises the control of" a certain percentage of those shares. J.A. __ § 28(A) (Dkt. 363-1) (emphases added). "Shares or securities" are the object of the acquisition, and control is merely a potential "consequence of such acquisition."

Plaintiffs also latch onto a reference in YPF's Bylaws to "indirect" acquisition, which they contend can refer to acquisition of control. Opp. 76. But under the Bylaws, "indirect" acquisitions refer to acquisitions by the "purchaser's"

corporate parents, subsidiaries, or affiliates. *See* Republic Br. 60-61. Section 7(h) of YPF's Bylaws confirms that reading: it provides that an acquirer in breach of the tender-offer provisions who "has obtained the direct control of YPF" will be subject to the specified penalties "until such shares of stock are sold," or, "if the takeover has been indirect," "until the [acquirer] loses the control of the YPF's parent company." J.A. __ § 7(h) (Dkt. 363-1). In either case, Section 7(h) clearly presupposes that the acquirer or its subsidiary has taken title to those shares.

Plaintiffs seize on the Bylaws' use of the shorthand "*Adquisiciones de control*" in the original Spanish. Opp. 63. But "*Adquisiciones de control*" is a defined term, consisting of the acquisitions described in Section 7(d). *See* J.A. __ § 7(d) (Dkt. 363-1) (Spanish) ("Las adquisiciones a las que se refiere este inciso d) se denominan 'Adquisiciones de control.'"); J.A. __ § 7(d) (Dkt. 363-1) (English) ("Acquisitions referred to in this subsection d) are called 'Takeovers.'"). And Section 7(d) (which applies through Section 28) says that an "acquisition" triggering the tender-offer obligation requires ownership, either directly or through a related company, of shares crossing a certain stock threshold. *Id.* The use of the shorthand "*Adquisiciones de control*" cannot change the full definition of "acquisition" provided in YPF's Bylaws—and that full definition requires *ownership* of a particular stake.

Ultimately, plaintiffs again seek refuge (at 63) in the supposed "purpose" of YPF's Bylaws to "reassure foreign investors" in the 1993 YPF IPO (that they did not participate in). They assert that if acquisition of title to shares is required to trigger the tender-offer obligation, then the Republic could have re-nationalized YPF without making a tender offer by indefinitely extending its intervention decree, without acquiring any shares. But under Argentine law, a "decree of necessity and urgency" like the YPF intervention decree is valid only while there are "extreme circumstances of necessity"—the government's "mere convenience" will not suffice. *See* National Supreme Court of Justice, 2010/05/19, "Consumidores Argentinos v. EN – PEN," S.C. Comp. 923. XLIII (Add. 3a-35a). Moreover, under Argentine law, an expropriation is deemed abandoned if the government fails to either reach an agreement with the expropriated party regarding the value of the property or initiate a court action for expropriation. *See* S.A. 231-233. Plaintiffs cannot rest their contract interpretation on a theory that is impermissible under Argentine law.

### D. Argentina's General Expropriation Law Forecloses Plaintiffs' Claims.

Even if plaintiffs' breach-of-contract claims were permissible under Argentine private law, Argentina's public law would preclude those claims in the expropriation context here. The Argentine Supreme Court has already made clear that it would have adjudicated these cases under Argentina's public-law framework,

by transferring the analogous *De San Martín* case to an Argentine federal administrative-law court on the ground that public-law issues predominated. National Supreme Court of Justice, 2014/08/20, "De San Martín, José et al. v. EN – PEN," S.C. Comp. 731 L. XLIX (S.A. 252). And as leading experts on Argentine public law—including two former Argentine Supreme Court Justices—confirm, Argentina's public-law framework is exclusive. Argentine Public-Law Scholars Amicus Br. 9-14. In response, plaintiffs misread this Court's FSIA decision and fail to grapple with key Argentine Supreme Court precedent.

1. Plaintiffs primarily rest on their claim that this Court's 2018 FSIA decision somehow forecloses any argument premised on the Argentine General Expropriation Law. But, in holding that the FSIA did not jurisdictionally bar plaintiffs' claims, this Court did not rule on any question of Argentine law, including the bar on third-party claims that "impede" or "encumber" an expropriation or its effects under Article 28 of the General Expropriation Law. The district court clearly agreed when it construed for itself (albeit incorrectly) the General Expropriation Law in its summary-judgment decision. *See* S.A. 136-141.

Nor does this Court's FSIA decision implicitly resolve the Article 28 question. The relevant U.S.-law question under the FSIA was whether plaintiffs challenged sovereign or commercial activity. *See Petersen*, 895 F.3d at 204-206. By contrast, the relevant Argentine-law question under Article 28 is whether plaintiffs' claims

would impede or encumber the Republic's expropriation or its effects. *See* S.A. 233. The latter category is much broader, meaning that a claim can be based on a commercial act under the FSIA, but still impermissibly impede or encumber the Republic's expropriation or its effects in contravention of Article 28. *See* Republic Br. 63-68.

2.    On the merits, all plaintiffs say (at 64) is that their tender-offer rights were not the target of the expropriation, and their claims do not "encumb[er]" the expropriated shares. The first point is irrelevant, and the second inaccurate.

Article 28 is not limited to claims brought by the owner of the expropriated property. The use of the term "claimant" in the phrase "[t]he rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free from any encumbrance," S.A. 233, is significant. *See* Argentine Public-Law Scholars Amicus Br. 19. It "reveals a desire to reach more than those having full ownership rights over the expropriated asset." *Id.* Indeed, in Argentina, "[i]t is difficult to use a broader term than 'claimant,'" which is "broader than" the oft-used "expropriated party." *Id.* In addition, the first sentence of Article 28 explicitly refers to "third parties," which can only mean parties other than the owner of the expropriated property. S.A. 233.

By any measure, requiring the Republic to conduct a multi-billion-dollar tender offer is an encumbrance on the expropriation of the shares. Having to pay

billions of dollars to clear the way to expropriate shares in a listed company falls squarely within Article 28's meaning of "encumbrance," which "includes any duties or liabilities created under private arrangements, which would otherwise be triggered by the acquisition of [the expropriated] property by reason of the expropriation." Argentine Public-Law Scholars Amicus Br. 21.  Indeed, plaintiffs' counsel acknowledged in the district court that the expropriated "shares were *encumbered* by this obligation not to vote without tendering." J.A. __ (Dkt. 61 at 37) (emphasis added).

Notably, in granting summary judgment, the district court failed to address any of the Argentine Supreme Court cases about expropriation cited by the Republic. In a single paragraph of their opposition, plaintiffs similarly try to sweep under the rug Argentine Supreme Court decisions adopting an expansive definition of what constitutes an impediment to or encumbrance on an expropriation under Argentine law. *See* Opp. 66.  Plaintiffs briefly recount the facts of each case, but do not explain how those superficial distinctions make any substantive difference.  The fact that these cases involve a tender-offer requirement and *Hidronor* involved a forum-selection clause, *Rosario* a notice provision, and *Ferrocarril* an obligation to grant an easement does not render irrelevant the holdings of those decisions:  that a private-law obligation that affects an expropriation—but does not necessarily prevent it—constitutes an impermissible impediment.  *See* Republic Br. 67-68.  If

43

anything, the diversity of factual contexts confirms that, under Argentine law, a prohibited encumbrance can take a variety of forms.

Plaintiffs' failure to meaningfully address these on-point decisions of Argentina's highest court—or offer any competing cases of their own—would be unthinkable were this a case governed by U.S. Supreme Court decisions. The district court likewise failed to give the required "substantial . . . weight" to a foreign "government's expressed view of its own law," *Animal Sci.*, 585 U.S. at 46, when it entirely ignored these key Argentine Supreme Court cases. In its *de novo* review, this Court should reject the district court's superficial approach to another sovereign's law.

3.    Plaintiffs rely on the same faulty logic to excuse their decision to opt out of Argentina's exclusive process for adjudicating claims arising from an expropriation. They assert that this process is only for those whose property was expropriated, and that the compensation paid by the Republic at the end of the process was solely for Repsol's shares. *See* Opp. 65. That is wrong, as the facts here illustrate: other similarly situated YPF minority shareholders whose property was not expropriated—but who raised claims in Argentina based on the tender-offer provisions in YPF's Bylaws—were included in the $5 billion settlement agreement between the Republic and Repsol. *See* J.A. __ (Dkt. 363-15 at 13, Annex VI).

Plaintiffs also ignore Argentine precedent. The Argentine Supreme Court held in no uncertain terms in *Puerto de San Nicolás*—a case that the district court also ignored—that third parties must "ensur[e] that their interest is taken into account for the appropriate estimation of the asset," and that they have "no right to a compensation distinct and separate from that of the . . . owner." National Supreme Court of Justice, 1911/02/16, "Puerto de San Nicolas v. Provincia de Buenos Aires," Fallos: 114:124 at 126 (S.A. 299); *see* Organización Federal de Estados Productores de Hidrocarburos Amicus Br. 9-13 (explaining that plaintiffs' proposed alternative remedies for third parties undermine similar expropriation procedures in the laws of Argentina's Provinces).

This Court has recognized that "[s]tates are at liberty to carry out . . . expropriations in the manner and form they consider best." *Petersen*, 895 F.3d at 201 (citation omitted). Argentina has established a system for carrying out expropriations and compensating those affected, specifically including third-party claimants. That system independently bars plaintiffs' private-law breach-of-contract claims for damages over the Republic's "breach" of the tender-offer provisions in YPF's Bylaws.

## III. AT A MINIMUM, PLAINTIFFS' DAMAGES MUST BE RECALCULATED.

Even if the district court's liability ruling could stand, its damages award must be reduced. The district court committed a clear legal error in miscalculating

plaintiffs' damages based on the exchange rate on the day of the supposed breach rather than the day of the judgment, as New York requires. The court then compounded its error by selecting a breach date and prejudgment interest rate not supported by Argentine law.

### A. Plaintiffs Cannot Escape New York's Judgment-Day Rule.

As the Republic explained (at 72-78), the district court was wrong to calculate plaintiffs' damages using the currency-conversion rate on the date of breach, rather than the date of judgment. New York enacted a law in 1987 requiring courts to convert obligations "denominated in a currency other than currency of the United States" into U.S. dollars "at the rate of exchange prevailing on the date of entry of the *judgment*." N.Y. Jud. Law § 27(b) (emphasis added). The tender-offer obligation here was necessarily "denominated" in pesos because the formula for pricing it could *only* be calculated in pesos. J.A. __ § 7(f)(v)(B) (Dkt. 377-1). Thus, once the court chose to make up a damages remedy nowhere authorized in YPF's Bylaws, *see supra*, pp. 29-32, it *had* to calculate those damages in pesos, as plaintiffs' own damages expert did.[7]

---

[7] YPF expands on these points in Part III of its brief, and the Republic incorporates those arguments here by reference.

Specifically, Formula D, used in the district court's damages calculation, provides that the tender-offer price is YPF's "net income per class D share during the last four complete fiscal quarters immediately preceding the notice date," multiplied by the higher of "the price/income ratio for that period for class D shares of stock" or "the highest price/income ratio for the Corporation during the two-year period immediately preceding the notice date." J.A. ___ § 7(f)(v)(D) (Dkt. 363-1). Each component of this formula is calculated in pesos—(1) the price of class D shares that only trade on the Buenos Aires Stock Exchange and (2) YPF's net income reported in pesos—and so too is the ultimate tender-offer price.

Plaintiffs have no persuasive response to these basic points. They complain that applying the judgment-day rule would be unfair, but their contrary theory would result in billions of dollars in windfall damages not authorized by New York law. Plaintiffs chose the New York forum, over Argentina's repeated objection; if that choice sticks, they must accept its legal consequences.

1.    Plaintiffs first claim that Section 27(b) of New York's Judiciary Law requires courts to apply the judgment-day rule only for "payment" obligations, not "performance obligations."   Opp. 68-69.   In plaintiffs' view, the Republic's obligation was only to make a tender *offer* to minority shareholders, not to make the *offered payment*, and thus Section 27(b) does not apply. *Id.* at 69.

Plaintiffs' hair-splitting theory finds no support in the text of Section 27(b), which does not use the words "payment" or "performance." Instead, Section 27(b) requires courts to apply the judgment-day obligation to all obligations "denominated" in foreign currency. As the Republic has explained, "denominated" encompasses all obligations that necessarily must be calculated in a foreign currency, as plaintiffs' expert calculated the damages here applying the specific tender-offer formula in YPF's Bylaws. Republic Br. 75-76; *see* YPF Br. 61 (chart demonstrating how plaintiffs' expert calculated damages in pesos). And an obligation can be "denominated" in foreign currency, whether cast as performance or payment.

Even if the text of Section 27(b) distinguished between payment and performance obligations, the YPF tender-offer obligation plainly falls on the "payment" side of the line. The district court relied on one decision, *Nature's Plus Nordic A/S* v. *Natural Organics, Inc.*, 78 F. Supp. 3d 556 (E.D.N.Y. 2015), as an example of a "performance" obligation to which Section 27(b) did not apply. But in *Nature's Plus*, the obligation was to provide notice and an opportunity to cure a breach of contract, not to make any payment thereunder. *Id.* at 557. Here, by contrast, the alleged obligation was to conduct a tender offer—*i.e.*, to offer somebody a specified amount of money in exchange for shares *and to pay those who accept the offer*.

Plaintiffs try to avoid Section 27(b) by distinguishing the act of paying somebody money from the act of *offering* to pay someone money, and note that "shareholders would have been free to . . . reject" any tender offer. Opp. 69. But the fundamental premise of plaintiffs' suit for damages—again, a remedy not contemplated or authorized by YPF's Bylaws—is that they *would have* accepted a tender offer if the Republic had made one. *See* J.A. __ (Dkt. 371 at 3) ("Plaintiffs were damaged as a result, as they were left with shares far less valuable than the cash tender-offer price that minority shareholders were promised in the Bylaws."). Indeed, that is precisely why they seek billions in damages here—plaintiffs are suing the Republic because the Republic did not *pay* them for the securities they once held. They do not seek damages for any failure by the Republic to make an *offer* that they might have rejected.

Recognizing that their interpretation of Section 27(b) is untenable, plaintiffs urge the Court to apply a limiting construction. Opp. 69-70. They assert that Section 27(b) is a "narrow statutory departure" from the general common-law rule that judgments must be dollar-denominated. *Id.* at 70. That is wrong. As the Republic demonstrated in its opening brief, New York no longer has *any* common-law rules for currency conversion, because "subsections (a) and (b) [of Section 27] cover the entire universe of money judgments." Republic Br. 76; *see id.* at 72-73 (showing the common-law rule is "long-abrogated"). Plaintiffs have no response. Because

Section 27 eliminates any remaining role for the common-law rule, there is no narrow construction for departures from it.

In any event, the district court's reading of Section 27(b) fails regardless. The statutory text and context make clear that Section 27(b) uses the word "denominated" to capture obligations that necessarily must be calculated in a foreign currency. *See* Republic Br. 76; *see Denominate*, *Black's Law Dictionary* (11th ed. 2019) ("To show, point out, or indicate."). The district court concluded that the obligation here was not "denominated" in pesos within the meaning of Section 27(b) because YPF's Bylaws did not expressly set out a sum certain in pesos, but rather a formula for calculating the tender-offer price in pesos. S.A. 147. But Section 27(b) *cannot* be read to cover only obligations expressed in a sum certain without making a hash of the statute. As the Republic has explained (at 76), a money judgment must be either "computed in dollars and cents" under Section 27(a) or "denominated in" a foreign currency under Section 27(b). The only logical way to read Section 27(b), then, is to cover all monetary obligations that are *not* computed in dollars and cents, like this one under the pricing formula in YPF's Bylaws, whether expressly set out as a sum certain or necessarily calculated as one. Plaintiffs have no response to that point either.

2. In the alternative, plaintiffs say that the Republic was obligated to make a tender offer for ADRs, and that this offer would have been made in dollars rather

than pesos. Opp. 73-74. To begin with, the text of YPF's Bylaws does not obligate the Republic to make a direct tender offer for ADRs. Section 28(B) of YPF's Bylaws provides that if the "National Government" has made an "acquisition" of YPF shares triggering a tender-offer obligation, its "purchase offer . . . shall be limited to the aggregate amount of *class D shares* of stock." J.A. __ § 28(B) (Dkt. 363-1) (emphasis added). ADRs are an "indirect" way to hold shares, but they are not themselves shares; instead, they are receipts issued by a local custodian bank representing interests in a foreign-traded security. *See* J.A. __ § 7(i) (Dkt. 363-1); *see Law Debenture* v. *Maverick Tube Corp.* 2008 WL 4615896, at *11 (S.D.N.Y. Oct. 15, 2008) (holding that ADRs are not "common stock"). Any tender-offer obligation in YPF's Bylaws was limited to outstanding class D shares; the Bylaws nowhere required the Republic to tender directly for ADRs.

Moreover, plaintiffs' theory that such a tender offer for ADRs would have been made in dollars is pure speculation. Plaintiffs rely on their expert Nancy Lissemore, who opined that "[t]he vast majority of ADR tender offers I have seen are priced in USD." J.A. __ (Dkt. 364-33 ¶ 19). But even Lissemore acknowledged that she had seen "the tender for ADRs . . . priced in a foreign currency." *Id.* Defendants' securities expert Professor Solomon identified real-world examples of tender offers made only in non-U.S. currency and only for shares, not ADRs, of companies that listed both. *See* J.A. __ (Dkt. 377-63, ¶¶ 162-167). Plaintiffs also

say (at 74) that other entities, including YPF, Repsol, and Petersen, have made and accepted offers for YPF ADRs in dollars. But whatever YPF or some shareholders may have done for convenience does not define what other shareholders are *obligated* to do under YPF's Bylaws, and here, there is no obligation to make an offer to ADR holders in dollars.

3.      Finally, plaintiffs try to avoid the application of Section 27(b)'s judgment-day rule by contending that they "suffered their damages in U.S. dollars." Opp. 74. But plaintiffs do not even attempt to connect that vague theory to Section 27(b)'s text. Nor could they—nothing in the statute ties the application of the judgment-day rule to the currency in which the plaintiff allegedly suffered its losses. Instead, plaintiffs are left to appeal to fairness, insisting that they will not receive "full compensation for the harm sustained" unless the court applies a breach-day rule. Opp. 75 (citation omitted). But New York has determined that there is nothing unfair about requiring those to whom a foreign-currency obligation is owed to accept the risk of currency devaluation.

## B.      The District Court Applied the Wrong Breach Date and Prejudgment Interest Rate.

The district court further inflated plaintiffs' damages by using the wrong breach date and prejudgment interest rate. Plaintiffs contend that the breach date was a factual issue and the interest rate a discretionary one, and that this Court should defer to the district court on both. To the contrary, these were fundamental errors of

Argentine law that each inflated plaintiffs' damages by billions of dollars. *See* Republic Br. 78, 81 & n.10.

1.     Even though their own principal Argentine-law expert, Professor Bianchi, took the opposite position in sworn testimony, plaintiffs insist (at 76) that April 16, 2012—the day the Republic appointed an intervenor to manage YPF— rather than May 7, 2012—the effective date of the YPF Expropriation Law, which declared Repsol's shares subject to expropriation and provided for their temporary occupation—was the date on which the Republic gained control over those shares. Plaintiffs reason that if the Republic exercised control *over YPF* "*as a company*" as of April 16, that must mean that the Republic exercised at least indirect control *over Repsol's shares* as of that date. *See* Opp. 76-77 (emphasis added). But under Argentine law, managerial rights are not the same as shareholder rights, such as the right to vote shares and obtain dividends, as plaintiffs' own expert recognized. *See* Republic Br. 78-81.

On the dispositive question of when the Republic held shareholder rights, plaintiffs have little to say. They primarily contend that Repsol was no longer able to exercise its shareholder rights as of April 16, 2012, so that must be when the Republic held shareholder rights. But Repsol's asserted loss does not automatically equal the Republic's gain, and plaintiffs cite no authority saying as much. In reality, *no one* exercised the rights associated with Repsol's shares during the period

between April 16 and May 7: neither Repsol nor the Republic voted Repsol's shares or collected dividends associated with those shares during that period. *See* Republic Br. 79-80.

Plaintiffs next try to explain away their principal expert's sworn concession that the Republic did not control Repsol's shares before May 7, 2012. Opp. 79 n.11. They claim that Dr. Bianchi conceded only that the Republic *exercised* the rights associated with the shares on May 7, not that it first *controlled* the shares on May 7. But context makes clear that when Dr. Bianchi made the concession, he was contrasting managerial control and shareholder control. He testified unequivocally that the "Argentine government exercised complete control of YPF's *management*" on April 16 and "exercised its *shareholder rights* in connection with the . . . shares" on May 7. *See* J.A. __ (Dkt. 47 ¶ 38) (emphases added). The district court failed to grapple with that concession, or even to mention Dr. Bianchi in its 25-page opinion on damages. *See* S.A. 163-187; J.A. __ (Dkt. 487 at 69-136).

In the end, plaintiffs again fall back on the false narrative that the Republic could have taken control of YPF without ever expropriating Repsol's shares by extending the intervention decree indefinitely. Opp. 78-80. They claim (at 80) that "no reasonable investor" would have participated in the YPF IPO had they known that Argentina could re-nationalize the company by intervening in its management in perpetuity. But as explained above, at p. 40, Argentine law places strict limits on

an intervention, a point which investors already relying on Argentine law for their protection would have recognized.

2. Plaintiffs further say that the district court properly used the prejudgment interest rate applied by Argentine commercial courts because these cases involve purely commercial obligations. That premise is incorrect, because these cases turn on Argentine public law governing expropriations. *See supra*, pp. 40-45. Plaintiffs do not dispute that in *De San Martín*, which also arose out of the Republic's expropriation of YPF's shares and the tender-offer provisions of YPF's Bylaws, the Argentine Supreme Court concluded that public-law issues predominated, and that the case thus belonged in the country's federal administrative-law courts. National Supreme Court of Justice, 2014/08/20, "De San Martín, José et al. v. EN – PEN," Jurisdiction No. 731 XLIX (S.A. 252). Thus, under Argentine law, the district court should have used the prejudgment interest rate applied by Argentine federal administrative-law courts, which would have been about 0.76%, rather than the 8% rate that the court applied. That simple error ballooned plaintiffs' judgment by nearly $7 billion. *See* Republic Br. 81.

## IV. IN THEIR CROSS-APPEAL, PLAINTIFFS CANNOT RESUSCITATE THEIR LEGALLY FLAWED CLAIM FOR PROMISSORY ESTOPPEL.

On cross-appeal, plaintiffs contend that the district court was wrong to dismiss Petersen's claim for promissory estoppel at the outset of the litigation, S.A. 45-46,

and they ask that Eton Park be allowed to amend its complaint to plead the same cause of action, Opp. 90 n.12. For three independent reasons, the court did correctly dismiss Petersen's claim. It is also far too late for Eton Park—which first brought suit nearly eight years ago—to add a new claim to its complaint. *See McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (concluding that motion to amend filed "nearly two years" after original complaint was correctly denied based on "inordinate delay").

*First*, as the district court correctly recognized, Argentine law does not recognize a standalone cause of action for promissory estoppel. S.A. 46. As plaintiffs' expert opined, "the doctrine of estoppel is not an autonomous source of obligations." J.A. __ (Dkt. 47 ¶¶ 92-93). In response, plaintiffs say that YPF's expert Dr. Kemelmajer testified that promissory estoppel *can* be an autonomous obligation in "the absence of a contractual relationship between the parties." Opp. 91 (quoting J.A. __ (Dkt. 36 ¶ 47)). Plaintiffs thus argue that if the Court finds that there is no contractual relationship giving rise to breach-of-contract claims in these cases, Petersen's promissory-estoppel claim should proceed.

Plaintiffs misunderstand both Dr. Kemelmajer's testimony and Argentine law. Dr. Kemelmajer explained that the two closest analogues in Argentine law to the American-law doctrine of "promissory estoppel" are the concepts of "pre-contractual liability" and "estoppel." J.A. __ (Dkt. 36 (Kemelmajer Decl.) ¶¶ 45-

46). According to Dr. Kemelmajer, those concepts arise in the "absence of a contractual relationship," but only in narrow circumstances not present here. *Id.* ¶ 47. Pre-contractual liability "arises when the discussions preliminary to the formation of a contract are interrupted because of the arbitrary or erratic actions of one of the parties." *Id.* ¶ 46. Plaintiffs' claims are not based on pre-contract discussions. Estoppel, meanwhile, is not a standalone claim but rather an interpretive tool to help determine whether a party has breached a promise. *See id.* ¶¶ 46-47 (estoppel "stops someone from going against their own prior acts"). But plaintiffs are trying to bring a claim, not use an interpretive tool, here. Outside of those specific doctrines, Argentine law does not allow a plaintiff to use promissory estoppel to fill the gaps if a court rejects a breach-of-contract action.

*Second*, as the district court also correctly concluded, Petersen's promissory-estoppel claim impermissibly duplicates its breach-of-contract claim. S.A. 46. Like New York law, Argentine law does not permit plaintiffs to dress up a duplicative breach-of-contract claim as a promissory-estoppel claim. *See* J.A. __ (Dkt. 36 ¶¶ 47-49); *Goldberg* v. *Pace University*, 88 F.4th 204, 207 (2d Cir. 2023). The core of Petersen's promissory-estoppel claim was that the Republic made "promises" that "*were communicated to investors by means including the bylaws* and the U.S. IPO Prospectus," and that Petersen relied on those promises to its detriment years later. *See* J.A. __ (Dkt. 1 ¶ 65) (emphasis added). But that merely rehashes Petersen's

breach-of-contract theory, which claimed that "Plaintiffs were damaged by Argentina's breach" of contractual promises made in "YPF's bylaws." J.A. __ (*Id.* ¶¶ 52, 54). And the mere fact that a breach-of-contract claim fails does not mean that a promissory-estoppel claim automatically arises in its place.

*Third*, Argentine law forecloses Petersen's promissory-estoppel claim for many of the same reasons it forecloses plaintiffs' "breach of contract" claims. As a threshold matter, such a claim would not belong in U.S. federal court any more than plaintiffs' "breach of contract" claims do. Both the doctrine of *forum non conveniens* and principles of international comity independently would require dismissal. *See* Republic Br. 29-42; *supra*, pp. 6-18. Additionally, YPF's Bylaws penalty clause would still provide the exclusive remedy for any such promissory-estoppel claim, and damages would still not be available. Again, Petersen's promissory-estoppel claim is based on the same supposed "promises" "communicated to investors" in "the bylaws." J.A. __ (Dkt. 1 ¶ 65). The penalty clause in Section 7(h) of YPF's Bylaws provides the exclusive remedy for the violation of such promises. *See* Republic Br. 11-12; pp. 29-32, *supra*. Finally, just like plaintiffs' breach-of-contract claim, any promissory-estoppel claim in these cases would violate Argentine public law by "impeding" the expropriation. As shown above, Argentina's General Expropriation Law provides the exclusive and comprehensive scheme for compensating shareholders following an expropriation,

and third-party claims for promissory estoppel would "impede" or "encumber" the expropriation or its effects. *See* Republic Br. 61-71; pp. 40-45, *supra*.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgments below or, at a minimum, vacate the judgments and remand with instructions to recalculate plaintiffs' damages.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*

Robert J. Giuffra, Jr.
Sergio Galvis
Adam R. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Attorneys for the Argentine Republic*

June 24, 2024

**Addendum of Additional Argentine-Law Sources
Not Included in Special Appendix**

## TABLE OF CONTENTS

**Page**

Civil Code, Article 814……………………………………………………1a

National Supreme Court of Justice, 2010/05/19,
    "Consumidores Argentinos v. EN – PEN," S.C. Comp. 923. XLIII.........3a

# LIONBRIDGE

STATE OF NEW YORK )
                           )
                           )     ss
COUNTY OF NEW YORK )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Art. 814.


Ethan Ly, Managing Editor
Lionbridge


Sworn to and subscribed before me

this _23rd_ day of _JUNE_ , 20 _24_ .

LAURA E MUSICH
Notary Public - State of New York
NO. 01MU6386791
Qualified in Queens County
My Commission Expires Jan 28, 2027

**1a**

Art. 814. A delegation by which a debtor gives the obligation with respect to the creditor to another person does not result in novation if the creditor has not expressly declared their intent to release the original debtor.

**2a**

# LIONBRIDGE

STATE OF NEW YORK          )
                          )
                          )          ss
COUNTY OF NEW YORK        )

### CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Consumidores Argentinos v.

EN – PEN.

Ethan Ly, Managing Editor
Lionbridge

Sworn to and subscribed before me

this _23rd_ day of _JUNE_ , 20 _24_ .

LAURA E MUSICH
Notary Public - State of New York
NO. 01MU6386791
Qualified in Queens County
My Commission Expires Jan 28, 2027

**3a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National Executive Branch – Decree 558/02-SS - Law 20,091 re Amparo Law 16,986.

*Bicentennial Year*

Buenos Aires, May 19, 2010

Having regard to the case file: "Consumidores Argentinos v. EN [National State] - PEN [National Executive Branch] - Decree 558/02-SS - Law 20,091 re Amparo Petition Law 16,986."

Whereas:

1) "Consumidores Argentinos, Asociación para la Defensa, Educación e Información del Consumidor" [Argentine Consumers, Association for the Defense, Education and Information of Consumers], filed a petition for a writ of *amparo* [protection of constitutional rights] under the terms of Article 43 of the National Constitution and Law 16,986, against the National Executive Branch, in order to obtain a declaration of unconstitutionality of Decree of Necessity and Urgency 558/02, insofar as it materially modifies Law 20,091 on Insurance Entities and Oversight Thereof; and "harms, restricts, alters, and threatens the rights and guarantees contained in the National Constitution in an arbitrary and manifestly unlawful manner," specifically those rights and guarantees contained in its arts. 17, 18, 42, 75, paragraph 12, and art. 109. The petition emphasized, on the one hand, that art. 1 of Decree 558/02 included, after the last paragraph of art. 29 of Law 20,091, the possibility for insurers in a situation of temporary illiquidity to create and constitute debt subordinated to the general and special privileges derived from insurance contracts. It also emphasized that art. 2 of the challenged decree replaced art. 31 of the law with a provision that establishes portfolio assignments without the requirement of public notice, the exclusion of the insurer's assets, and the impossibility of initiating acts to seize the excluded assets and to declaring injunctive measures against such assets. On a substantive level, these modifications, according to the petition, specifically cause the following alterations: (i) they preclude the exercise of the right of opposition based on a case of portfolio transfer, and consequently violate art. 42 of the National Constitution; (ii) they allow for the exclusion of the

**4a**

insurer's assets without giving any notice to policyholders, in violation of the right to property (art. 17 of the National Constitution); (iii) they restrict the exercise of the right to enforce unpaid debts on the debtor's assets, thus impacting the right to property (art. 17 of the National Constitution); (iv) they limit the declaration of injunctive relief measures on the debtor's assets and impose an obligation on judges to order the lifting of measures levied against excluded assets at the will of the insurance companies, in violation of the rights to property, equal standing, due process, and the principle of separation of powers (arts. 17, 18 and 109 of the National Constitution); (v) they eliminate judicial authorization in requesting the annulment of ineffective decisions and allow assets to be excluded even when a state of insolvency exists, violating the rights to property, equal standing, due process, and the principle of separation of powers (arts. 17, 18 and 109 of the National Constitution); (vi) they limit the rights of the insurer's creditors with respect to the assets excluded from its holdings, which violates the rights to property, equal standing, and the guarantee of due process. With respect to the nature of the regulatory provision used by the National Executive Branch to introduce the contested modifications, the plaintiff held that the requirements that enable the exercise of the power to issue decrees of necessity and urgency were not met. Rather than urgency, it states, there was a "plain and simple intention on the part of the National Executive Branch to provide a 'bailout' to the sector of the insurance business whose equity situation was most compromised" (p. 6 verso).

2) Chamber II of the National Court of Appeals for Federal Administrative Litigation, in confirming the lower court's judgment, granted the claim.

**5a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

In its decision, it held that it was not enough for the situation to be an emergency; rather, there must be a circumstance so exceptional that following the legislative process would be impossible, and that in this case, even though the former criterion was present, the latter was not met, since the National Congress was in session. The ruling also pointed out that the decree contained regulations of a permanent nature, modifying the laws of the National Congress, which results in a deviation from the rights recognized by arts. 14, 17, 18 and 42 of the National Constitution.

3) The defendant filed an extraordinary appeal against this decision (pp. 211-225, with the response contained on pp. 228-229); this appeal was granted (p. 233). The grounds for appeal have been adequately described in point II of the opinion of the Public Prosecutor, to which we refer in order to avoid unnecessary repetition.

4) The federal relief is admissible, since the challenge concerns the scope, interpretation and constitutional validity of a decree from the National Executive Branch—which is unequivocally federal in nature—in light of art. 99, paragraph 3 of the Constitution (art. 14, paragraphs 1 and 3 of Law 48).

5) With respect to the constitutionality of this type of decree, it is of utmost importance to establish the requirements that must be met in order to consider them validly issued.

To this end, we must recall the purposes that guided the members of the 1994 Constitutional Convention when they decided to expressly incorporate the power under review into the National Constitution.

The relevant fact for the decision was the Executive Branch's systematic overreach in the exercise of this power. Although it is true that the Constitution did not formally include any such

**6a**

rule, the reality of the institution has shown such a tendency, and its natural consequence, which was none other than the weakening of the democratic republican system. For this reason—and with the conviction that the lawful exercise of power and the full validity of institutions require the optimization of political action through the incorporation of structural and operational rules that safeguard transparency, celerity, and efficiency—the members of the Constitutional Convention considered it advisable to explicitly regulate this power. They based that decision on the need to include parameters that restrict its interpretation and that are in accordance with the rules, values, and principles of the Argentine constitutional system (Parliamentary Debate on Law 24,309, Declaration of the Need for Reform, Session Journal, National Chamber of Deputies, December 21 and 22, 1993, pp. 4093-4110).

In this sense, the constitutional reform stated that its objectives included that of "attenuating presidentialism," while at the same time stating the need to "modernize and strengthen Congress" and "strengthen oversight mechanisms," all directly related to the purpose of "fine-tuning the balance of powers." The methodology used was to incorporate certain exceptional powers for the constitutional branches, on the grounds that this meant the institutionalization of the oversight mechanisms to which they were subject.

During the constitutional debates, when referring to aspects of the constitutional reform, Assembly member García Lema stated that "the contents of the Core of Basic Agreements reflect—as does the authorization of the topics included in Article 3 of the declaratory law—certain

**7a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

purposes, certain core ideas, which serve as the main objectives of this reform. The first is undoubtedly the need to consolidate and fine-tune the democratic system (...) The second great core idea is to generate a new balance in the functioning of the three classic bodies of State power—the Executive, the Legislative, and the Judicial—and this, in turn, is reflected in the attenuation of the presidentialist regime, the strengthening of the role of Congress, [and] the greater independence of the Judiciary" (Journal of Sessions of the National Constitutional Convention, Santa Fe-Paraná, 1994, Parliamentary Secretariat, Volume II, pp. 2210-2211).

In line with the concepts mentioned in the previous paragraph, Convention member Paixao pointed out that "(...) two realities of our institutional history justify, by themselves and in a sufficient manner, the reform of the National Constitution (...) These are two realities that embody two different forms of concentration of power in our historical Constitution and in the institutional life of that Constitution (...) One of them is linked to the concentration of power in the national Executive Branch (...)." Accordingly, he continued, the set of reforms "(...) means accepting the fact that the current historical stage of Argentina is not the stage of hyper-presidentialism at the service of national organization, but rather that of a decentralization of power that enables the harmonious, consensus-based progress of the greatest possible number of members of political society" ("Journal of Sessions," op. cit., Volume II, pp. 2211-2212).

In turn, Convention member Alfonsín argued that the intention of the Constitutional

**8a**

Convention was to "(...) attenuate presidentialism and to disperse the powers of the President," and that by enacting these reforms, it sought to "(...) avoid the degradation of democracy and its institutions that endangered our Republic (...)." He added, referring to the concentration of power in the Executive Branch, that "(...) Such concentration of power distorts representativeness and the system of separation of powers, and it weakens control over the validity and legitimacy of Executive actions by the other branches of government..." (National Constitutional Convention, 1994, National Ministry of Justice, Volume V, pp. 5155-5156).

6) The National Constitution, insofar as it regulates decrees of necessity and urgency, must be interpreted in line with the principles of the constitutional state.

This is the case because the constitutional convention delegates decided to adhere to certain fundamental principles for living together in society, that were designed to be enduring and immune to the temptation to change them in the face of foreseeable changes of opinion. This shared feeling is built on certain foundations that must be acceptable to those whose opinions are farther apart because of a specific dispute, that will be acceptable in subsequent conflicts when their positions of power or weakness change, and that will be applied by future generations because they will have become a consolidated constitutional practice.

7) The principle that organizes the functioning of the statute of power is the division of duties and reciprocal oversight, a framework that was not modified by the constitutional reform of 1994. Thus, the National Congress holds the legislative function, the Executive Branch holds the

**9a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

regulatory function, and the Judicial Branch issues judgments and is the highest authority for exercising control over the constitutionality of laws and regulations. From this perspective, it can in no way be argued that the Executive Branch can freely take over the activity of Congress or that it is not subject to judicial oversight.

8) The foregoing leaves no room for doubt that the reforming Convention of 1994 intended to attenuate the presidential system, strengthen the role of Congress, and ensure greater independence of the Judiciary (see, similarly, "Verrocchi," Rulings: 322:1726, and the citations therein). Therefore, this is the spirit that should guide the courts of law both when determining the scope that should be assigned to the provisions of art. 99, paragraph 3 of the National Constitution, and when reviewing the National Executive Branch's actual compliance with those provisions when issuing a decree of necessity and urgency.

9) In this same vein, we must point out that the aforementioned art. 99, paragraph 3 establishes that the Executive Branch may only issue legislative provisions *"...when exceptional circumstances make it impossible to follow the ordinary procedures provided by this Constitution for the enactment of laws and [such provisions] are not rules that regulate criminal, tax, or electoral matters or the political party regime.*" Such decrees *"...shall be decided by general agreement of the ministers, who shall countersign them, together with the chief of the cabinet of ministers.*"

Then, in the last paragraph, the constitutional rule regulates the formal requirements for the communication of decrees issued to a Standing Bicameral Committee of Congress, and for its

**10a**

treatment in both chambers. It is established therein that "*...within ten days, the Chief of the Cabinet of Ministers shall personally submit the measure to the consideration of the Standing Bicameral Committee, whose composition shall respect the proportion of political representation in each Chamber. This committee shall submit its report within ten days to the full body of each Chamber for express treatment, which shall be immediately considered by the Chambers. A special law enacted by an absolute majority of all members of each Chamber shall regulate the procedure for and scope of Congressional intervention*."

In that same sense, art. 100, paragraph 13 provides that the Cabinet Chief "*shall countersign decrees of necessity and urgency together with the other ministers (...)*," and it establishes that this official "*(...) shall, within ten days of their enactment, personally submit such decrees to the consideration of the Standing Bicameral Committee*."

10)     The transcribed language is eloquent, and the words chosen in its drafting leave no room for doubt that the Executive Branch's exercise of legislative powers is admissible under strictly exceptional conditions and is subject to formal requirements, which serve as a limitation and not an extension of the practice followed in the country ("Verrocchi"). Thus, for the exercise of this exceptional power to be valid, the Constitution requires that—in addition to due consideration by the Legislative Branch—the rule must not regulate criminal, tax, electoral, or political-party matters, and that there must be a state of necessity and urgency.

11)     As regards the existence of a state of necessity and urgency, in this specific case it

**11a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

is the duty of this Court to evaluate the factual scenario that would justify the adoption of decrees that meet such exceptional circumstances.

If, in exercising its power of oversight of the enactment of emergency laws by Congress, this Court has found, based on the precedent in Rulings 136:161 ("Ercolano") that there is a genuine emergency situation that imposes on the State the duty to protect the vital interests of the community—that is, to corroborate that the legislator's declaration finds "due support in reality" (Rulings 172:21 ("Avico"); 243:449 ("Nadur"); 313:1638 ("Videla Cuello"); 330:855 ("Rinaldi"), among many others), there is all the more reason for it to conduct the same evaluation with respect to exceptional circumstances when they are unilaterally invoked by the National President as a reason to exercise legislative powers that, by constitutional rule, do not belong to that office (arts. 44 and 99, paragraph 3, subparagraph 2 of the National Constitution).

In this regard, we should note that art. 99, paragraph 3 of the 1994 Constitution explicitly laid out judicially verifiable standards with respect to the circumstances that must be met in order to enable the National President to issue legislative provisions. The Judiciary must then evaluate whether the circumstances invoked are exceptional, or whether they appear to be manifestly nonexistent or unreasonable; in the case of the latter, the power exercised will lack the constitutional factual support needed to legitimize it.

12)    Furthermore, it should be clarified that the constitution's provision of guidelines that may be determined and specified in each specific case authorizes the Judiciary to confirm the

**12a**

compatibility between decrees issued by the Executive Branch and the National Constitution; this does not imply that it is making an assessment that would replace the responsibility of the body with purview over the matter or usurp the powers of other national authorities.

In this sense, this Court has always affirmed that one fundamental principle of our political system is the separation of the government into three independent and sovereign supreme political branches, each in their sphere, but always respecting the authorities of each one of them ("Criminal v. Ríos, Ramón et al."; Ruling 1:32). Specifically referring to the powers of the Judiciary, in 1857 Senator Zapata, the National Senate author of the bill for the organization of the federal judiciary that preceded Law 27, argued that the power of federal judges "arises from the right they have to base their decisions on the Constitution, over laws, or, in other words, to not apply laws that seem unconstitutional to them, and also to adjudicate the constitutionality of governmental acts (...) This immense public power, which at first sight and in general might seem very alarming and dangerous, is actually not, provided that we take into account the fact that federal judges must always operate within the scope that confines every judiciary " (National Chamber of Deputies, *El Poder Legislativo de la Nación Argentina* [*The Legislative Branch of the Argentine Nation*], by Carlos Alberto Silva, Volume VI, p. 97).

13)     Once we accept the power of this Court to evaluate the factual situation that would justify the adoption of decrees with such exceptional characteristics, we must outright discard, as a mistaken assumption, the Executive Branch's criteria of mere convenience—which, because this never involves extreme circumstances of necessity—never justify the officeholder's decision to

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

impose an exceptional right on the nation under circumstances that are not exceptional. The language of the National Constitution does not allow for a discretionary choice between the enactment of a law or the speedier imposition of certain material content by means of a decree.

In the "Verrocchi" decision, this Court ruled that in order for the national president to legitimately exercise the exceptional legislative powers that, in principle, are not under his or her purview, one of these two circumstances must exist: 1) it must be impossible to pass the law through the ordinary procedure provided by the Constitution, i.e., the chambers of Congress cannot meet due to circumstances of force majeure that prevent this, as would occur in the case of war or natural disasters that prevent them from meeting or for legislators to travel to the Federal Capital; or 2) the situation that requires a legislative solution must be of such urgency that it must be resolved immediately, in a period of time incompatible with that required by the normal procedure for laws (recital 9).

14)     This case refers to a decree issued prior to the creation of the Standing Bicameral Committee referred to in art. 99, paragraph 3 of the Constitution, which, due to the subject matter it deals with (commercial in nature) is not one of those prohibited by the Constitution.

For purposes of evaluating the existence of a state of necessity and urgency in the matter under review, the Executive Branch—as already indicated—introduced several amendments to the provisions of Law 20,091 by means of Decree 558/02. Specifically, it added a final paragraph to article 29 of that law, whereby the National Insurance Superintendence is empowered to exempt

**14a**

insurance companies from the prohibition in paragraph 'g' of that same legal provision in situations of temporary illiquidity (art. 1); replaced the texts of arts. 31 and 86, paragraph 'a' of the law (arts. 2 and 3); and added a final paragraph to art. 33 of the law (art. 4).

In the reasoning for the decree, the Executive Branch maintained that Law 25,561 had materially modified the "(...) economic scenario of the country, which includes the insurance market, which has major implications for individual economies, production, persons, and social security" (recital 1); and that the measures derived from the aforementioned law had "(...) significantly affected the operations carried out by insurance entities"; such that it was "(...) urgent and unpostponable "to issue rules that would allow the National Insurance Superintendence, as the oversight entity for the activity, "(...) to manage the different alternatives for regularizing and stabilizing the market, in order to safeguard the interests of the insured" (recital 2). At the same time, after taking into account "(...) the impact of the latest economic measures enacted," the Executive considered "(...) it appropriate to enable companies to resort to credit in situations of illiquidity" and to authorize them, "(...) under certain conditions, to resort to credit subordinated to the privileges of the insured" (recital 3). It also stated that it was necessary to shore up the powers and authorities of the aforementioned control agency in order to "(...) allow it to intervene in insurance company restructuring processes in an effective and timely manner" (recital 4).

**15a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

However, in regard to what we are most interested in here, the Executive Branch pointed out that "(...) the critical situation of economic and financial emergency the country is experiencing, in which the insurance market operates, constitutes an exceptional circumstance that makes it impossible to follow the ordinary procedures provided by the NATIONAL CONSTITUTION for the enactment of laws, resulting in the urgency and necessity of enacting this decree" (recital 5), for which purpose it invoked "(...) the powers conferred by art. 99, paragraph 3", of the Constitution (recital 7).

Furthermore, it should be noted that the modifications to Law 20,091 introduced by the Executive Branch do not reflect a decision of a temporary nature aimed at alleviating an alleged exceptional situation in the sector; rather, to the contrary, they are permanent rules modifying laws of the National Congress.

Under these conditions, we must conclude that the decree challenged in the matter under dispute is invalid, since the factual circumstances that Article 99, paragraph 3 of the National Constitution describes in exacting terms do not exist (see "Verrocchi," recital 10).

Therefore, and in accordance with the opinion of the Public Prosecutor, the extraordinary appeal is declared admissible, and the appealed judgment is upheld. With costs. For notification and, in due course, return to the court of origin. RICARDO LUIS LORENZETTI - ELENA I. HIGHTON de NOLASCO (as voted) - CARLOS S. FAYT - ENRIQUE SANTIAGO PETRACCHI (as voted) - JUAN CARLOS MAQUEDA (as voted) - E. RAUL ZAFFARONI - CARMEN M. ARGIBAY (as voted).

THIS IS A COPY

OP-//-

**16a**

**17a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National Executive Branch – Decree 558/02-SS - Law 20,091 re Amparo Law 16,986.

*Bicentennial Year*

-//-INION OF THE VICE-PRESIDENT DOÑA ELENA I. HIGHTON de NOLASCO

Whereas:

The undersigned agrees with recitals 1 to 13 of the vote that heads this statement, which are considered reproduced in their entirety.

14)     In this case, the challenged decree—of a commercial nature—does not address one of the matters expressly prohibited by text of the constitution.

On the other hand, the challenged regulation was issued prior to the creation of the Standing Bicameral Committee referred to in art. 99, paragraph 3 of the National Constitution. *This circumstance enables this Court—in the absence of the **proper legislative control** required by the Constitution—to evaluate the factual assumption—the existence of a state of necessity and urgency—that would justify the adoption of decrees that meet such exceptional assumptions.*

15)     Within the framework of this analysis and for the purpose of evaluating the existence of a state of necessity and urgency in the matter under review, the Executive Branch—as already indicated—introduced several amendments to the provisions of Law 20,091 by means of Decree 558/02. Specifically, it added a final paragraph to art. 29 of that law, whereby the National Insurance Superintendence is empowered to exempt insurance companies from the prohibition of paragraph 'g' of that same legal provision in situations of temporary illiquidity (art. 1); replaced the texts of arts. 31 and 86, paragraph 'a', of the law (arts. 2 and 3); and added a final paragraph to art. 33 of that law (art. 4). In the reasoning for the decree, the Executive Branch maintained that Law 25,561 had substantially modified the "(...) economic scenario of the country,

**18a**

which includes the insurance market, which has major implications for individual economies, production, persons, and social security"; and that the measures derived from the aforementioned law had "(...) significantly affected the operations of the insurance entities"; such that it was "(...) urgent and unpostponable "to issue rules that would allow the National Insurance Superintendence, as the control entity for the activity, "(...) to manage the different alternatives for regularizing and cleaning up the market, in order to safeguard the interests of the insured." At the same time, after taking into account "(...) the impact of the latest economic measures enacted," the Executive considered "(...) it appropriate to enable companies to resort to credit in situations of illiquidity" and to authorize them, "(...) under certain conditions, to resort to credit subordinated to the privileges of the insured." It also stated that it was necessary to shore up the powers and authorities of the aforementioned oversight agency in order to "(...) allow it to intervene in insurance company restructuring processes in an efficacious and timely manner".

16)     Decree 558/02 was issued in the context of political, social, and economic events that gave rise to one of the most acute crises in the contemporary history of our country: a public and well-known fact whose seriousness was recognized by the Court in repeated opinions (Rulings: 328:690 "Galli"; 330:855 "Rinaldi"; and 330:5345 "Longobardi", among others).

However, the filings made by the National State in the course of the proceedings do not provide any evidence that would allow the Court to reach the conclusion that the complex general economic context in which the challenged provision was issued had affected the insurance sector

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

in such a way as to require, for the purpose of safeguarding the general interests of society, a reorganization and standardization that could not be implemented through the ordinary channels provided by the Constitution. This is even more evident if we consider that the decree under review contains permanent provisions regulating the aforementioned activity—a matter that pertains to the policing power exercised by the legislature—whose application went beyond the emergency situation that the Executive sought to use as grounds to justify its enactment.

In this context, it is not possible to conclude that the adoption of immediate measures was necessary in this case, since it has not been demonstrated that there was a risk in the sector that would not only affect the insurance companies but, in view of the general interest involved in the activity, would have repercussions on the universe of policyholders and the rest of society.

For these reasons, the factual circumstances that art. 99, paragraph 3 of the National Constitution describes in exacting terms (see the case law in "Verrocchi" cited above, recital 10), have not been found to exist in this case, as alleged in the recitals of the contested decree. This circumstance makes it clear that the challenged decree is constitutionally invalid.

-//-

**20a**

-//- Therefore, and in accordance with the opinion of the Public Prosecutor, the extraordinary appeal is declared admissible, and the appealed judgment is upheld. With costs. For notification and, in due course, return to the court of origin. ELENA I. HIGHTON de NOLASCO.

<u>THIS IS A COPY</u>

<u>OP</u>-//-

**21a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

-//-INION OF JUDGE JUAN CARLOS MAQUEDA

Whereas:

The undersigned agrees with points 1 to 13 of the preceding opinion, which are deemed to be fully reproduced.

14)    In this case, the challenged decree was issued prior to the creation of the Standing Bicameral Committee referred to in art. 99, paragraph 3 of the National Constitution, and the appellant has provided no evidence or statements during the course of the proceedings that this act has been ratified by the Legislative Branch.

In our constitutional system, the National Congress is the only body charged with the legislative function. Therefore, one can only conclude that acts emanating from the National Executive Branch in exercise of the powers conferred by the aforementioned provision may only be identified with a law as of their ratification by Congress, since it is from that moment, and not before, that the legislative will embodied in a regulation exists (arg. Ruling 331:1927 "Caligiuri," dissenting opinion of Judge Maqueda).

Consequently, the absence of legislative involvement in the matter under review that would allow one to infer the will of the National Congress to ratify or repeal Decree 558/02, is sufficient to determine that it is constitutionally invalid. This is the case because one of the conditions required for the legality of the exercise of the exceptional power granted to the Executive Branch, in the case of decrees issued prior to the creation of the Standing Bicameral Committee set forth by art. 99, paragraph 3 of the National Constitution, has not been met (Ruling 331:1927, cit.).

**22a**

15)     Notwithstanding the foregoing, it should be noted that the decree under consideration here does not pass the test of constitutional validity based on an examination of the existence of grounds of necessity and urgency. In this regard, I believe it is appropriate to reiterate that it was the intention of the members of the Constitutional Convention, when enacting the constitutional reform, to set strict limits on the Executive Branch with regard to decrees of necessity and urgency, with the purpose of establishing formal restrictions on the presidential voluntarism that prevailed in this matter prior to 1994.

In this regard, it is appropriate to once again quote the opinion of the reporting member for the majority, Convention member García Lema, who, in justifying the decision adopted on the matter, stated that "(...) It was then necessary to decide whether it was advisable for decrees of necessity and urgency to be maintained as a para-constitutional practice, recognized by important pieces of legal scholarship and case law, or whether they should be regulated in the Constitution itself. This second solution was chosen, because it seems logical that even issues that are difficult to deal with constitutionally should be provided for in the constitution, despite any conflicts that may arise...."

He added that "(...) The main advantage of regulating decrees of necessity and urgency in the Constitution is that this makes it possible to circumscribe them subject to certain procedures that will entail profound changes with respect to previous practices. This results in the need for the national President to issue them through a general resolution of the cabinet of ministers; for the Cabinet Chief to not only sign the decree but also personally present it to the Bicameral Oversight

**23a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.


*Bicentennial Year*

Committee to be created in this matter; for the committee to then have a shortened period of ten days to issue a decision, and for the matter to be submitted to the full sessions of the Chambers so that they may expressly decide on it. These seem to be profoundly innovative mechanisms over these prior practices...” (“Journal of Sessions,” op. cit, Volume II pp. 2217-2218).

In turn, Convention member Ortiz Pellegrini, when analyzing the proposed text for the regulation of decrees of necessity and urgency, stated that “(...) In the procedural stage, we can distinguish two sub-stages: the executive and the legislative (...). At this legislative stage, the constitutional design places us within the framework of the Legislative Branch, which... [with express reference to article 82 of the National Constitution] has the obligation to express itself. In all cases, tacit or implied enactment has been prohibited. The first is silence and the other is expression by other means. This has enormous importance for Argentine constitutional law. There can be no more decrees on which Congress remains silent; it must speak, state, and express itself, according to the Constitution, and with this we forever repeal the grim doctrine established in the Peralta case, which upheld silence as a statement by Congress. No more may Congress's silence be interpreted as consent to the Executive Branch... The Peralta case has come to an end; it is dead. And, in this sense, I have no doubt that we are doing an enormous service to Argentina and to the democratic functioning of my country. Thus, there is an executive stage, where the decree of necessity and urgency is issued and is enforceable. There is a legislative stage, because Congress must necessarily approve or revoke it. If the second stage is missing, it is clear that the decree will be null and void. I conclude by saying that the national Supreme Court may exercise judicial

**24a**

control regarding the substantive requirements that I just mentioned, in the proceedings—tautology aside—of the procedural stage, to see whether all the requirements have been met. If any of them is missing, the result will be nullity..." ("Journal of Sessions," op. cit., Volume II, pp. 2451-2453).

16)    It is therefore clear that the language of art. 99, paragraph 3 of the National Constitution has established, as a general principle, that the President is prohibited from issuing rules of legislative substance. Consequently, the rule that governs everything related to decrees of necessity and urgency is that they are prohibited "under penalty of absolute and irremediable nullity." This principle may only be waived, according to the text of the constitution itself, in the event of an exceptional circumstance that makes it "impossible to follow the ordinary procedures provided by the Constitution for the enactment of laws."

At this point, it is not pointless to reiterate that the language of the constitution does not allow us to conclude that the necessity and urgency referred to in art. 99, paragraph 3 is the necessity and urgency of the Executive Branch to impose its agenda—usually of circumstantial political origin—thus usurping the national Congress in the exercise of the legislative activity that is under its purview.

Even so, the reality of constitutional practice shows that the Executive Branch does not feel constrained by this constitutional rule, nor by principles such as the separation of powers, the republican form of government, the distribution of jurisdiction, and checks and balances between the branches, among others (Ruling 331:1927 cit.).

17)    It should be reiterated that in each specific case submitted for its consideration, it is up to the Judiciary to weigh whether there is truly a state of necessity and urgency that would enable the president to exercise the extraordinary legislative powers attributed to him or her. This

**25a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

responsibility implies clearly and categorically exercising a power of oversight with respect to the pre-existence of the situation invoked by the Executive Branch, whose resistance to recognizing such authority has been historically rejected by the most qualified legal scholarship.

Thus, the authority to serve as a legal control on the circumstances that prompt this type of decree had already been put forward by Hans Kelsen, who stated that "control of its constitutionality is quite important, since any violation of the Constitution means, in this regard, a shifting of the line that divides the spheres of government and Parliament, which is so important politically. The stricter the conditions under which the Constitution authorizes them, the greater the danger of an unconstitutional application of these provisions, and the greater the need for judicial control over their compliance. Experience teaches us, in fact, that wherever the Constitution authorizes such regulations, their constitutionality is always—rightly or wrongly—passionately contested" (*La garantía jurisdiccional de la Constitución* [*Judicial safeguarding of the Constitution*], pp. 61-62, Universidad Nacional Autónoma de México Edition, 2001).

Similarly, recognized Argentine constitutional legal scholarship has affirmed the possibility of judicial assessment of the grounds of necessity and urgency alleged by the Executive Branch when issuing a decree by invoking the powers of art. 99, paragraph 3 of the National Constitution. Germán Bidart Campos has pointed out that the exceptions contemplated in the aforementioned article "...must be interpreted very strictly so as not to undermine the general principle of prohibition. At the same time, this gives us reason to reinforce the need to ensure that

political controls and judicial controls of constitutionality are not inhibited but rather exercised fully and intensely, so that the exceptions are not used to circumvent the prohibitions..." (*Tratado Elemental de Derecho Constitucional Argentino* [*Elementary Treatise on Argentine Constitutional Law*], Volume II-B, p. 213). He adds that the justice system must objectively assess, in good faith, when exceptional circumstances occur that make it impossible to follow the ordinary procedure for enacting laws (*Manual de la Constitución reformada* [*Manual of the Reformed Constitution*], Volume III, p. 254). Miguel Ángel Ekmekdjian as well, in his *Tratado de Derecho Constitucional* [*Treatise on Constitutional Law*], Volume V, p. 97, warns that curtailing the Judiciary's oversight with respect to decrees of necessity and urgency enables the Executive Branch to issue the Civil Code, the Commercial Code, or labor laws by decree, in response to the likely passivity of Congress. Alberto Spota, in turn, affirms that recognizing the power granted by the Constitution to the federal courts to assess the validity of decrees of necessity and urgency is a statement of the principle of constitutional supremacy ("*La Corte Suprema de Justicia de la Nación como parte del poder político del Estado* [*The National Supreme Court as Part of the Political Power of the State*,*" La Ley [Law], 1990-B, 979).

18)     For purposes of evaluating the existence of a state of necessity and urgency in the situation under review, it is worth remembering that Decree 558/02 was issued in the context of political, social, and economic events that gave rise to one of the most acute crises in the contemporary history of our country: a public and well-known fact whose seriousness was recognized by the Court in repeated opinions (Rulings: 328:690 "Galli"; 330:855; "Rinaldi"; and 330:5345 "Longobardi," among others). However, the filings made by the National State in the

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

course of the proceedings do not provide any evidence that would allow the Court to reach the conclusion that the complex general economic context in which the challenged provision was issued had affected the insurance sector in such a way as to require, for the purpose of safeguarding the general interests of society, a reorganization and standardization that could not be implemented through the ordinary channels provided by the Constitution. This is even more evident if we consider that the decree under review contains permanent provisions regulating the aforementioned activity—a matter that pertains to the policing power exercised by the legislature—whose application went beyond the emergency situation that the Executive sought to use as grounds to justify its enactment.

In this context, it is not possible to conclude that the adoption of immediate measures was necessary in this case, since outside of the particular situation of each insurance company, it is not clear what risk existed in the sector that could compromise the general interest and have repercussions on the universe of policyholders and the rest of society.

For these reasons, the factual circumstances that art. 99, paragraph 3 of the National Constitution describes in exacting terms (Ruling 322:1726 cit.) have not been found to exist in this case, as alleged in the contested decree.

19)     All of the foregoing provides evidence of the constitutional invalidity of Decree 558/02, inasmuch as it does not constitute—due to the absence of ratification by Congress—a complex act in which the will of the Executive Branch and the Legislative Branch are present (see Ruling 331:1927 cit.), to which circumstance we must add the absence of the exceptional situation of necessity and urgency prescribed by the 1994 Constitution.

**28a**

Therefore, and in accordance with the opinion of the Public Prosecutor, the extraordinary appeal is declared admissible, and the appealed judgment is upheld. With costs. For notification and, in due course, return to the court of origin. JUAN CARLOS MAQUEDA. <u>THIS IS A COPY</u>

OP-//-

**29a**

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.


*Bicentennial Year*

-//-INION OF JUDGE CARMEN M. ARGIBAY

Whereas:

The undersigned agrees with points 1 to 10 of the foregoing opinion, which are deemed to be reproduced in their entirety.

11)    As I have already stated in the "Massa" decision (Ruling 329:5913), art. 99, paragraph 3, second subparagraph of the National Constitution establishes the following general prohibition: "The Executive Branch may in no case issue provisions of a legislative nature, under penalty of absolute and irremediable nullity." This prohibition especially includes the President, as the official who serves as the Executive Branch (art. 87 of the National Constitution).

Therefore, any legislative provision issued by the Executive Branch must be deemed *prima facie* unconstitutional, a presumption that can only be rebutted by whoever demonstrates that the conditions for applying the only exception allowed in the Constitution to the general prohibition set forth above have been met: namely, the one described in the third and fourth subparagraphs of art. 99, paragraph 3 of the National Constitution, already transcribed in point nine of this decision.

12)    According to the very terms of Decree 558/2002, this provision is unequivocally legislative in nature, which is also evident if we take into account that it introduced permanent modifications to the rules established by Law No. 20,091, referred to as the "Law on Insurance Entities and Oversight Thereof."

Now, in this case, and after the issuance of the challenged decree, nothing similar to the legislative procedure provided for in paragraph three of Article 99(3) of the National Constitution took place, and therefore there was no timely pronouncement by the Chambers of Congress.

**30a**

Regarding the latter, it does not escape my attention that at the time that Decree 558/02 was issued, Congress had not issued any provision organizing the operation of the Bicameral Committee mentioned in Article 99(3) of the Constitution, a situation that continued until Law 26,122 came into effect in 2006. I am also aware of the opinion according to which this delay by Congress had authorized the President to issue decrees of necessity and urgency without following the constitutional procedure, since to assume otherwise would imply granting one of the branches (the Legislature) the possibility of indefinitely blocking the exercise of an authority that pertains to another branch (the Executive) (Ruling 320:2851 "Rodríguez," ground 13 and Ruling 322:1726, "Verrocchi," dissenting opinion of Judges Nazareno, Moliné O'Connor, and López, particularly grounds 8 and 9).

Given the acceptance this argument has attained, I will briefly state why I believe it is not plausible.

13) In the absence of the regulatory law referred to in Article 99(3) of the Constitution, two different standards can be adopted as a basis for assessing the validity of those legislative provisions issued by the President known as "decrees of necessity and urgency": namely, either the one based on a presumption of constitutionality, or to the contrary, the one that presumes them to be unconstitutional. The first presumption is based on presumed compliance with the rule permitting [such decrees] on an exceptional basis (art. 99[3], subparagraphs three and four), while the second is based on the disregard of the general principle that prohibits [such decrees] (art. 99[3], subparagraph two). Both positions have their implications: the first, that Congress would be

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

able to transform the exception into a rule through an indefinite delay in issuing the regulation, and thus affording the President a broad range of powers that the Constitution sought to deny him or her; the second, that Congress would, through that same delay, manage to cancel out or severely restrict the exceptional powers granted to the President.

As we can see, there are no options without implications, and it is in this context that I am inclined to take, as a starting point, the constitutional system as it was created: if the President's exercise of the legislative function is made conditional upon compliance with the procedure provided for in Article 99(3), subparagraphs three and four of the Constitution, *and it has not been proven, in the case, that these conditions have been met*, then the legislative provisions issued by the President fail to overcome the penalty established by the Constitution itself: that is, their absolute and irremediable nullity.

This is the decision that I understand to be more in line with the purposes that inspired the action of the National Constitutional Convention of 1994. On the other hand, legislative delay was not entirely unforeseeable for the members of the convention, if we recall that they did not set any deadline for the enactment of the regulation—as they did in other matters—and submitted it to a qualified majority, which is obviously more difficult to achieve. The same cannot be said of the interpretation with which I disagree, which leads to a largely unchanged continuity of the state of affairs prevailing until 1994, as if there had never been a Constitutional Convention that enacted constitutional rules for the purpose of attenuating presidentialism—*attenuation* that can only be understood in relation to the prior situation.

Consequently, since the constitutional mechanism of the exception has not been complied

with, Decree 558/02 must be deemed to have been issued in violation of the general principle set forth in art. 99, paragraph 3, subparagraph two of the National Constitution.

14)     In view of the foregoing, it is appropriate to declare that Decree 558/02 is absolutely and irremediably null and void under the terms of art. 99(3), subparagraph two of the National Constitution.

Therefore, and having heard the opinion of the Public Prosecutor, the extraordinary appeal is declared admissible, and the appealed judgment is upheld. With costs. For notification and, in due course, return to the court of origin. CARMEN M. ARGIBAY. THIS IS A COPY

OP-//-

C. 923. XLIII.
Consumidores Argentinos v. National State - National
Executive Branch – Decree 558/02-SS - Law 20,091 re
Amparo Law 16,986.

*Bicentennial Year*

-//-INION OF JUDGE ENRIQUE SANTIAGO PETRACCHI

Whereas:

1) Chamber II of the National Court of Appeals for Federal Administrative Litigation confirmed the lower court judgment declaring that decree "of necessity and urgency" 558/02 was defective due to absolute and irremediable nullity (see pp. 137-139 verso and 205-208 verso).

The defendant filed an extraordinary appeal against this judgment (pp. 211-225 verso), which was properly granted by the court below on the basis of art. 14, paragraph 1 of Law 48 (p. 233).

2) It is undisputed that the National Executive Branch issued Decree 558/02 as a decree of necessity and urgency (art. 99, paragraph 3 of the National Constitution). The recitals of the decree mention that "*the critical situation of economic and financial emergency the country is experiencing [...] constitutes an exceptional circumstance that makes it impossible to follow the ordinary procedures provided by the National Constitution for the enactment of laws, resulting in the urgency and necessity of enacting this decree.*" It then states *"(t)hat this decree is issued in the exercise of the powers conferred by article 99, paragraph 3 of the National Constitution*."

3) In light of the statements made in Judge Petracchi's opinion in the "Verrocchi" case (Ruling 322:1726, 1738), which are deemed to have been reproduced here, it is appropriate to conclude that decree of necessity and urgency 558/02 is invalid. In fact, as was held in that opinion, the pathway established in article 99, paragraph 3 of the National Constitution required that Congress enact the "special law" that would make the articles operative, and it was not appropriate

**34a**

to discuss here the merits of the criterion chosen, since the Court only had to consider its meaning and consequences. So long as the law is not enacted as required by Article 99, paragraph 3 of the National Constitution, the legislative "sub-stage" provided for in that article could not be completed, and this makes it impossible to resort to those exceptional remedies known as decrees of necessity and urgency.

As we all know, the special law required by the Constitution (No. 26,122) was only enacted in 2006, which is why decree of necessity and urgency 558/02 is irremediably null and void.

Therefore, in accordance with the opinion of the Public Prosecutor, the extraordinary appeal is formally declared admissible, and the appealed judgment is upheld. With costs. For notification and, in due course, return to the court of origin. ENRIQUE SANTIAGO PETRACCHI.

<u>THIS IS A COPY</u>

Extraordinary appeal filed by **the National State**, represented by Dr. **Beatriz Pernas**.
The **plaintiff**, represented by **its representative, Dr. Clemente Etchegaray**, has responded to this brief.
Court of origin: **National Court of Appeals for Federal Administrative Litigation, Chamber 2.**
Courts previously involved: **National Court for Federal Administrative Litigation No. 11.**

**35a**

## CERTIFICATE OF COMPLIANCE

This Brief complies with Local Rule 28.1.1(a), because it contains 13,995 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

June 24, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, I filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

June 24, 2024